TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nevada Bar No. 3984
1130 Wakefield Trail
Reno, NV 89523
(775) 337-0323
Keysercooper@lawyer.com

PETER GOLDSTEIN
Peter Goldstein Law Group
Nevada Bar No. 6992
10161 Park Run Drive, Suite 150
Las Vegas, NV 89145
(702) 474-6400
peter@petergoldsteinlaw.com

*Attorneys for Plaintiffs*
*Susan Lynn Clopp and Paris Fridge*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SUSAN LYNN CLOPP and PARIS FRIDGE as Co-Administrators of the ESTATE OF MICIAH WILLIAM LEE, | Case No. |
| Plaintiffs, | **COMPLAINT FOR DAMAGES** (Jury Demand) |
| v. | 1. Failure to Train |
| CITY OF SPARKS; ERIC DEJESUS; RYAN PATTERSON; JAMES HAMMERSTONE; JAMES AHDUNKO; and DOES 1-10, | 2. Violation of the ADA |
| | 3. Municipal Liability-Ratification |
| | 4. Supervisor Liability |
| Defendants. | 5. Excessive Force |
| _____/ | 6.  Deprivation of Familial Relations |
| | 7. Wrongful Death |
| | 8.  Survival Action |
| | 9.  Negligence |

**<u>INTRODUCTION</u>**

1.      This civil rights action seeks compensatory and punitive damages from Defendants

for violating various rights under the United States Constitution and state law in connection with the

police shooting death of the decedent, Miciah William Lee. The Complaint alleges police officers

1

employed by the City of Sparks were called to take a suicidal teenager they knew to be severely mentally ill into custody, for his own safety, but within minutes, of approaching him  shot him dead. The Complaint further alleges City of Sparks officers had the time and opportunity to assess the situation and employ the tactics and accommodations recognized by nationally accepted police practices and training to peacefully resolve the situation, specifically by using de-escalation techniques, communication, and crisis intervention. The evidence will establish the officers were trained to act in precisely the manner they acted and, thus, were trained to do precisely the wrong thing. If the officers had been properly trained in the fundamental principles of maintaining a covered position to calmly communicate with an armed emotionally disabled person rather than hysterically screaming commands, loudly cursing, sadistically using an attack dog, and cruelly rushing the teenager, with lights flashing and sirens blaring, this incident would not have happened. In short, the officers' actions were contrary to proper police practices for dealing with mentally disabled persons. Sparks' police practices were diametrically opposed to proper police procedures, out of synch with the rest of the police profession, and plainly foolish. The actions taken by the officers were preordained to result not in a safe and peaceful self-surrender, but in the inevitable death of the mentally ill teenager.

## JURISDICTION AND VENUE

2.      This action arises under Title 42 of the United States Code ("U.S.C.," 28 U.S.C. Sections 1983 and 1988) and Title II of the Americans With Disabilities Act ("ADA") 42 U.S.C. § 12101(b)(1) & (2). Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Sections 1331, 1343 and 42 U.S.C. § 12188(a).

3.      Venue is proper in the Northern District of Nevada pursuant to 28 U.S.C. § 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is

within this judicial district.

## **PARTIES**

4.      Miciah William Lee ("Miciah" or "Miciah Lee" or "the decedent"), was an African-American. He died on January 5, 2020 at the age of 18.

5.      Plaintiff Susan Clopp ("Clopp") is the biological mother of decedent Miciah Lee. Clopp is a citizen of the United States residing in Sparks, Nevada. Clopp is a co-special administrator of the estate of her son, decedent Miciah Lee.

6.      Plaintiff Paris Fridge ("Fridge") is the biological father of decedent Miciah Lee. Fridge is a citizen of the United States residing in Sunrise, Arizona. Fridge is a co-special administrator of the estate of his son, decedent Miciah Lee.

7.      Plaintiffs Clopp and Fridge may be collectively referred to as "the Plaintiffs."

8.      Defendant City of Sparks ("Sparks") is a municipal governmental entity duly incorporated under the laws of the State of Nevada. Under its authority, Defendant Sparks operates the Sparks Police Department ("SPD"), and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the employees of the SPD.

9.      Defendant SPD Officer Eric Dejesus ("Dejesus"), at all times relevant, was employed by the SPD. Dejesus was personally involved in the acts that deprived Miciah Lee of his particular rights and caused his death. Dejesus' conduct was so closely related to the deprivation of Miciah Lee's rights to be free from deliberate indifference to his disability under the Americans With Disabilities Act ("ADA") and to other federally and constitutionally protected rights. Dejesus, at all relevant times hereto, was acting under color of state law, and is sued in his individual capacity.

10.     Defendant SPD Officer Ryan Patterson ("Patterson"), at all times relevant, was employed by the SPD. Patterson was personally involved in the acts that deprived Miciah Lee of his particular rights and caused his death. Patterson's conduct was so closely related to the deprivation of Miciah Lee's rights to be free from deliberate indifference to his disability under the ADA and to other federally and constitutionally protected rights. Patterson, at all relevant times hereto, was acting under color of state law, and is sued in his individual capacity.

11.     Defendant SPD Officer James Hammerstone ("Hammerstone"), at all times relevant, was employed by the SPD. Hammerstone was involved in the acts that deprived Miciah Lee of his particular rights and caused his death. Hammerstone's conduct was so closely related to the deprivation of Miciah Lee's rights to be free from deliberate indifference to his disability under the ADA and to other federally and constitutionally protected rights. Hammerstone, at all relevant times hereto, was acting under color of state law, and is sued in his individual capacity.

12.     Defendant SPD Lieutenant James Ahdunko ("Ahdunko"), at all times relevant, was employed by the SPD. Ahdunko, as a supervisor, directed subordinates Dejesus, Patterson, and Hammerstone and Does 1-10 in the acts that deprived Miciah Lee of his particular rights and caused his death. Ahdunko set in motion a series of acts, or knowingly refused to terminate a series of acts by subordinates Dejesus, Patterson, and Hammerstone that he knew, or reasonably should have known, were objectively unreasonable, not in compliance with POST standards, and would cause the death of Miciah Lee. Ahdunko's conduct was so closely related to the deprivation of Miciah Lee's rights to be free from deliberate indifference to his serious mental health disability as to be the moving force that caused the death of Miciah Lee. Ahdunko, at all relevant times hereto, was acting under color of state law, and is sued in his individual capacity.

13.     Plaintiffs are at the time of the filing of this Complaint, ignorant of the true names

and capacities of Defendants Does 1-10, and, therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that Defendants Does 1-10 were employed by the SPD at the time of the conduct alleged herein. Plaintiffs allege Defendants Does 1-10 violated Miciah Lee's civil rights by their deliberate indifference to his serious mental health needs and disability and failed to provide the accommodations he required to prevent his death, thereby causing his death, and/or encouraged, directed, enabled and/or ordered other Defendants to engage in such conduct. Plaintiffs will seek leave to amend their Complaint to state the names and capacities of Defendants Does 1-10, when they are identified and ascertained. Does 1-10, at all relevant times hereto, were acting under color of state law, and are sued in their individual capacity.

14.     Plaintiffs allege that the conduct of each Defendant deprived Miciah Lee of his constitutional right to accommodation for his serious mental health disability and their failures ultimately caused his death.

15.     Each of the Defendants caused, and is responsible for, the unlawful conduct directed towards Miciah Lee. Each of the Defendants by participating in the unlawful conduct, or acting jointly and in concert with others who did, authorized, acquiesced, condoned, and approved the unconstitutional conduct by failing to take action to prevent to unconstitutional conduct which resulted in the death of Miciah Lee.

16.     Wherever reference is made in this Complaint to any act by Defendants, it is alleged that each Defendant was the agent of the others. Defendants were acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them shall also be deemed to mean the acts and failures to act of each Defendant individually, jointly or severally.

## **FACTUAL ALLEGATIONS**

### **Miciah Lee's Mental Health Background**

17.     Miciah Lee was born on May 12, 2001 with his umbilical cord wrapped around his neck. An umbilical cord is a lifeline for a baby in the womb. It provides oxygen, blood, and nutrients to the developing fetus. In a significant number of cases, nuchal cord complications can lead to a variety of birth injuries. It is unknown precisely what damage this caused Miciah but he suffered from significant medical and developmental issues from birth.

18.     Further, because of Miciah Lee's significant development issues, speech defects, and an inability to learn basic age related skills, from the age of three to five he was placed in Washoe County Child "Find Program" for special education. The "Find" program is a federally mandated program serving children ages three to five. Miciah attended the program three to four days a week for approximately three and one-half hours.

19.     Miciah expressed severe anger issues from early childhood, far beyond normal temper tantrums typical of children his age. While a loving and warm hearted child, his moods changed rapidly, and he could instantly become aggressive and belligerent. From the ages of approximately five to seven, Miciah attended Washoe County Children's Behavioral Services where he received individual counseling.

20.     Miciah had a difficult time as a student. He argued with teachers, fought with other students, and was uncontrollable in a classroom setting. Miciah was placed in "anger management" classes by the school district at the age of six for at least two years.

21.     At or about the age of seven or eight, Miciah attempted to jump out of a third-story window after being told he was "grounded" for misbehavior. Miciah's mother, Susan Clopp, took him to West Hills Behavioral Health Hospital, a mental health facility which provides psychiatric treatment for children and adults who are experiencing mental and emotional health issues. He was diagnosed as manic depressive and bipolar and prescribed psychiatric medications.

22.     After West Hills, despite his medications, Miciah became even more aggressive, fighting Clopp and his siblings continuously, refusing to attend school, and engaging in dangerous self-destructive behaviors. Miciah was repeatedly taken to a clinic associated with West Hills for medication review and adjustments.

23.     After West Hills Hospital and following Washoe County Children's Behavioral Services, Miciah also attended individual counseling with Psychologist Norris Dupree during approximately 2008 until 2010 while he continued to take his medications.

24.     During Miciah's tenure in Washoe County schools he had an Individualized Education Program ("IEP") because of speech and behavioral issues. Miciah would often, especially as he grew older, refuse to go to school and threaten to harm himself if forced to go to school.  Miciah's conduct regarding school was aggressive, self-destructive, and argumentative yet Miciah was often loving, appreciative, cooperative, and devoted to friends and family. His mood swings and bipolar condition made life extremely difficult for him and his family.

25.     When Michah was approximately 8½ to ten years old, his grandmother (Paris' mother) took him to Denver, Colorado to live with Paris.  They lived in Denver, Colorado and Miciah attended Florida Pitt Waller school. He then attended a STEM school in Denver, Colorado. When he was 13 years old he attended an all Boys Prep School.  He went to Collegiate Prep Academy his Freshman and Sophomore years of high school.  Micah received numerous awards while attending school in Denver, Colorado which consisted of the following:

- Graduate of the University of Colorado Mini Med School in October 2012;
- Certificate of Achievement for Demonstrating Hard Work from Sims-Fayola International Academy in 2013-2014;
- Certificate of Achievement for Demonstrating Commitment from Sims-Fayola International Academy in 2013-2014;
- Social Studies Award for Excellence in December 2014;
- Excellent Attendance from the Collegiate Preparatory Academy in February 2016;
- Excellent Grade Point Average 3.0-3.499 from the Collegiate Prep Academy Stars Mentoring Program in February 2016;

- Certificate of Appreciation from the College Prep Academy Stars Mentoring Program in 2016-2017

26.     At 16 years old Miciah went to live with his grandmother (Paris' mother) in Mississippi for the summer.

27.     At 16 ½ years old Miciah went to live with his mother in Reno. After living with his mom for 4-6 weeks, he moved and lived with Belinda (Paris' aunt) in Winnemucca, Nevada and lived there until his death.

28.     In 2017-2018 Miciah spiraled out of control following surgery for appendicitis. Miciah went through his prescribed pain killers and became progressively worse—complaining of constant pain. Miciah refused to attend school and was belligerent with Clopp, his school, and his family. Miciah for a time lived in Winnemucca, Nevada.

29.     In February 2019, Miciah went missing from Winnemucca. For a time he was homeless, living briefly with friends and extended family. Clopp called Winnemucca Sheriff's Department. In discussing the matter with law enforcement, Clopp explained Miciah had severe mental health issues, and was diagnosed as bipolar and manic depressive. Miciah was located at the Grand Sierra Resort gambling and drinking and was again belligerent and hostile to all who approached him. Miciah was taken to a juvenile detention facility and Clopp argued extensively with the Court and probation officials that Miciah was severely mentally ill and required medication for his bipolar and manic depressive disorders.

30.     In the week before Miciah turned 18, the Courts ordered Miciah interviewed for Crossroads Rehabilitation Center and Ridge House Rehabilitation Center but he was not accepted because he was uncooperative.

31.     In May 2019, Miciah was transported to Adolescent Treatment Center in Sparks at 480 Galetti Way, Bldg. 8A. This inpatient juvenile care facility focuses on mental health treatment

services where he remained two to four weeks until he turned 18 and discharged himself.

32.     From May 2019 until shortly before his death in January 2020, Miciah attempted gainful sporadic employment but had great difficulty controlling his bipolar related mood swings and could not hold a job.

33.     From May 2019 until his death, Miciah was sad, depressed, psychotic, and paranoid. Miciah was convinced the police and authority figures were "after him," and his friends and family were out to "get him." He told family members he "wasn't going to be around much longer," talked about suicide, and repeatedly apologized for "ruining" the lives of everyone he knew. He was inconsolable, frequently crying and staring out into space.

### The Day Time Events of January 5, 2020

34.     On January 5, 2020, Miciah was living in the home of his mother, his adult brother Jovanni Bowers, and his younger sibling J.L.

35.     On January 5th, all day, Miciah was nearly catatonic, sitting for hours staring into space, obviously deeply depressed. Miciah frequently discussed that he could not "make it" in this world and could not find a way to make a life for himself that "worked." Miciah apologized to his family for "ruining" their lives.

36.     In the late afternoon Miciah went outside, got in his car, and told his brothers he was going to drive off and kill himself. His brothers got in Miciah's vehicle and refused to get out and allow him to drive off. They begged him not to kill himself. His brothers pleaded with Miciah, cajoled him and argued with him telling him he did not have to kill himself, that he could get a good job and have a nice life. Jovanni, J.L. and Miciah all cried. Ultimately Miciah demanded his brothers get out of his car so he could go off to kill himself.

37.     Jiovanni called Clopp as she was leaving work. Jiovanni told Clopp Miciah was

trying to leave to kill himself and he had a gun. Miciah did not tell Jiovanni, J.L. or Clopp that the gun was unloaded and he had no bullets.

38.     Clopp arrived home from work at or about 5:00 p.m. Clopp went immediately to Miciah's vehicle to plead with him to give her the gun. Miciah refused, driving off with Jiovanni hanging on to the partially open passenger window, running alongside of the vehicle, and crying begging his brother not to harm himself. Miciah Lee was also crying. Within minutes, Miciah dislodged Jovanni and drove off.

39.     At the time Miciah drove off, he was not wanted to any crime, there were no outstanding warrants for his arrest.

40.     At the time Miciah drove off, he was in the middle of a serious mental health crisis.

### Call To 911

41.     Clopp called various people requesting they talk with Miciah. Finally, desperate and out of options, at or about 5:48 p.m. Clopp called 911, Sparks Police Emergency dispatch, informing them that her son Miciah Lee was suicidal, and mentally unstable. She told dispatch that Miciah Lee was bipolar. Clopp pleaded that her son not be shot.

42.     The information provided by Clopp, about Miciah's location, his mental state, his suicidal ideation, and the fact that he was armed with a handgun was broadcast to SPD officers via radio and computer transmission.

43.     Responding SPD officers met with Clopp who told them Miciah had a bipolar disorder, other mental health issues, and information about his car.

### The Killing of Miciah

44.     SPD Officer Patterson located Miciah Lee as he was turning towards 15th Street and initiated his lights and siren to stop Miciah. At the intersection of 15th Street and Rock Boulevard,

Miciah struck the rear end of an occupied blue sedan that was waiting at a stop sign. Patterson pushed his patrol vehicle against the rear of Miciah's vehicle, sandwiching Miciah's vehicle and effectively blocking him in.

45.     Patterson and other SPD officers exited their vehicles and began hysterically shouting and cursing at Miciah to exit his vehicle, to shut off his vehicle, and to show his hands.

46.     While the officers frantically yelled and cursed at Miciah, Lt. Ahdunko directed Hammerstone to fire a 40mm less-lethal foam launcher through the driver's side window in an attempt to shatter it and physically remove Miciah. Hammerstone complied.

47.     While the frantic hysteria of screaming and cursing and lights and sirens took place, Miciah, without gesturing or saying a single word, managed to maneuver his vehicle out from between the blue sedan and the police vehicle and drive off. Miciah made a left-hand turn onto North McCarran Boulevard but unable to negotiate the turn, crashed into a tall brick retaining wall which caused his vehicle to careen back across two lanes of traffic where it stopped crossways on the center median. It was not a pedestrian area, no pedestrians were about, nor would any pedestrians be expected as the retaining wall on either side of McCarran was extremely narrow and not made for foot traffic. There were no citizens or passerbys nearby and none were expected—as there was no place for foot traffic.

48.     Miciah's vehicle was completely disabled at the center median and no longer drivable which was obvious to the SPD officers. A wheel was completely off the vehicle. Miciah could not possibly have driven anywhere with a three wheel disabled vehicle. Further, SPD officers effectively blocked Miciah's potential for travel by hitting the front passenger and rear driver's side of his vehicle.

49.     Miciah was in a confined space, unable to escape, sitting in a disabled vehicle, and

surrounded by multiple officers.

50.     Miciah remained completely silent, at no time did he utter a word, charge the officers, run towards the officers, make a threatening gesture, or threaten to harm the officers or try to flee.

51.     Numerous SPD officers and vehicles were present with blaring lights and sirens.

52.     Patterson and numerous other SPD officers quickly exited their vehicles, drew their firearms, and began again shouting and commanding Miciah to "show his fucking hands." Patterson and Hammerstone went immediately and directly to Miciah's driver's side door where Miciah continued to sit in silence. Hammerstone yanked open Miciah's door yelling and cursing, thereby exposing Miciah. Patterson, a K9 officer, released his attack dog "Cabo" at Miciah. Cabo immediately lunged at Miciah and bit his left forearm. Miciah made no sounds or gestures. The circumstance was inappropriate to use a K-9.

53.     Patterson and Hammerstone did not warn Miciah they were going to use deadly force, yank open his door, or use an attack dog to lung and bite him.

54.     Miciah did not react even when the attack dog bit his arm.

55.     Within seconds of the canine attack, Patterson leaned into the vehicle attempting to grab Miciah and physically seize him from the car. While attempting to violently remove Miciah, Patterson saw Miciah's gun and hysterically screamed: "He's got a gun! He's got a gun!" even though he at all times Patterson **knew** Miciah had a gun. The gun was no surprise, the officers were informed by Clopp Miciah had a gun. The bodycam footage shows that Patterson acted surprised by the gun but it was broadcast repeatedly over all radio lines.

56.     Miciah did not point his unloaded gun at any of the officers, it was in a downward position near his knees.

57.     Patterson, in a crazed frenzy after seeing the gun that he already knew Miciah had, shot Miciah, striking him five times from close proximity.

58.     Simultaneously, while Patterson was shooting at Miciah from the driver's door, Dejesus approached Miciah's vehicle on the passenger side. When Dejesus heard Patterson yell "gun" Dejesus immediately discharged two rounds from his firearm, also striking Miciah. Dejesus was firing in the direction of Miciah, Patterson, and Hammerstone. Dejesus' act of shooting at Miciah placed the lives of Patterson and Hammerstone at risk as he was firing directly at them.

59.     There were a total of six gunshot wounds to Miciah's  head/neck, left upper back and right hip/thigh region.

60.     Sparks officials have publicly ratified the shooting death of Miciah Lee.

61.     Miciah was pronounced dead at the scene. From the time of Clopp's initial call to 911, until shots were fired and Miciah was dead, was 17 minutes.

**FIRST CAUSE OF ACTION**
**Failure to Train**
**As Against City of Sparks**

62.     Plaintiffs reallege all prior paragraphs of this Complaint and incorporate the same herein by this reference.

63.     Defendants used excessive force, killing Miciah Lee, who was seated in a disabled vehicle at the time of the shooting and who never attempted to strike or threaten anyone with harm, thereby depriving him of the rights and liberties secured to him by the Fourth and Fourteenth Amendments.

64.     SPD officers routinely deal with mentally ill disabled people.

65.     SPD officers routinely deal with suicidal people.

66.     SPD officers routinely deal with people who require protective care.

13

67.     SPD officers routinely are called upon to evaluate the need to use force in situations with mentally ill people armed with deadly weapons, such evaluations are a usual and recurring situation and the need for training in such encounters is obvious.

68.     Accordingly, the use of force against Miciah Lee arose under circumstances that constituted a usual and recurring situation. SPD is and at all times has been on notice it must provide proper training to its officers on police tactics and procedures in dealing with armed, mentally ill, and suicidal persons and must discipline its officers for violations of policies and training.

69.     SPD is further aware of its need to supervise, train, and discipline its officers concerning compliance with established police policies, practices and guidelines regarding interactions with armed, mentally ill and/or suicidal disabled persons.

70.     SPD is and has been aware that its officers have engaged in numerous officer involved shootings, which could have been reasonably avoided had its officers employed nationally accepted police tactics and techniques. Yet despite this knowledge SPD has done nothing to train its officers in such nationally accepted police tactics and techniques, to discipline them for their failures, or to hold them accountable for their gross violations.

71.     These failures have resulted in repeated officer involved shootings, fatalities, and injuries. SPD's training policies and procedures and/or failure to ensure compliance with existing training continues to this day. SPD's history of excessive force violations should have placed SPD on notice there was improper training and/or lack of compliance with existing training.

72.     SPD's custom and practice of turning the other way when officer involved shootings occur and refusal to discipline involved officers and/or employ additional training ensures the likelihood of repeat situations and continuous violations of the rights of citizens.

73.     SPD's failure to provide proper training represents a policy for which Sparks is responsible and for which Sparks is liable.

74.     SPD's inadequate training demonstrates deliberate indifference on the part of SPD towards Miciah Lee, and others similarly situated, with whom police officers will routinely come into contact.

75.     In the shooting death of Miciah Lee, Defendants Patterson, Dejesus, Hammerstone, and Ahdunko, and each of them, either failed to follow their training or they were improperly trained in how to achieve a safe and peaceful self-surrender and arrest with a severally mentally ill suicidal armed person.

76.     In the shooting death of Miciah Lee, Defendants Patterson, Dejesus, Hammerstone, and Ahdunko acted in a reckless provocative manner using techniques they knew or should have known, would greatly heighten the anxiety of a severely mentally ill suicidal person and reduce his ability to comply with demands. The techniques used by these Defendants were reckless and contrary to proper police practices for dealing with armed mentally ill severely disabled persons and diametrically opposed to proper police procedures, out of synch with the rest of the police profession, and plainly foolish.

77.     In the shooting death of Miciah Lee, Defendants Patterson, Dejesus, Hammerstone, and Ahdunko behaved in an aggressive, extreme and outrageous manner, designed to escalate anxiety and make it impossible for Miciah Lee to respond to demands.

78.     In the shooting death of Miciah Lee, the reckless and improper techniques used by Defendants Patterson, Dejesus, Hammerstone, and Ahdunko include, but are not limited to, hysterically screaming commands, loudly cursing, violently rushing, and physically grabbing at Miciah Lee while unleashing a K-9 attack dog to lunge and bite him. This conduct, with severely

mentally ill suicidal persons, has long been nationally recognized as reckless, provocative, and extremely likely to minimize the chances of a safe and peaceful self-surrender and increase the chances of death. This conduct, long rejected by police departments nationwide as out of synch with good police practices, and is recognized to likely result in death to officers and the individual.

79.     Well known, nationally accepted police practices in dealing with severally mentally ill and/or suicidal armed persons is to not agitate or excite such persons, to contain them, to respect their comfort zone, to use nonthreatening communications to de-escalate the situation and to allow the passage of time to defuse and de-escalate the situation and allow for a safe and peaceful self-surrender.

80.     By contrast, SPD trains its officers to leave cover and recklessly approach armed mentally ill and/or suicidal persons with the intent to grab them, have attack dogs lunge and bite at them, while cursing, yelling commands, barking orders, and doing everything possible in a hysterical frenzy to maximize anxiety and fear. SPD encourages such conduct, when it knows or reasonably should know, that such conduct will make it impossible for mentally ill suicidal persons to understand and/or comply with such commands or achieve a safe and peaceful self-surrender.

81.     The Police Officer Standards and Training ("POST"), teaches officers how to recognize symptoms of mental illness and respond to people demonstrating those symptoms without escalating a potentially dangerous situation. Defendants Patterson, Dejesus, Hammerstone, and Ahdunko are all graduates of POST. These Defendants at all times knew, and were taught at POST that loud, aggressive, belligerent, frenzied cursing and screaming at a severely mentally ill armed suicidal person will make it impossible to achieve a safe and peaceful self-surrender of such person.

82.     Defendants Patterson, Dejesus, Hammerstone, and Ahdunko knew of Miciah's Lee's suicidal ideation and history of mental illness. Because of this knowledge, it was imperative these

16

Defendants do nothing to increase Miciah Lee's stress level which they knew or should have known would interfere with his ability to understand and/or comply with directives or achieve a safe and peaceful self-surrender.

83.     Because Defendants Patterson, Dejesus, Hammerstone, and Ahdunko knew of Miciah's Lee's suicidal ideation and history of mental illness, they knew or should have known, it was imperative to urge Miciah Lee to remain in his car where he felt safe and work to calm him down, de-escalate the situation to achieve a safe and peaceful self-surrender.

84.     Because Defendants Patterson, Dejesus, Hammerstone, and Ahdunko knew of Miciah's Lee's suicidal ideation and history of mental illness, they knew or should have known, it was imperative Defendants at all times talk slowly and clearly in an even tone of voice to de-escalate the situation to achieve a safe and peaceful self-surrender.

85.     Contrary to proper training Patterson, Dejesus, Hammerstone, and Ahdunko all engaged in frantic screaming and cursing at Miciah, a tactic guaranteed to escalate Miciah's anxiety and make his peaceful self-surrender impossible and completely unnecessary under the circumstances.

86.     Contrary to proper training Patterson, with the assistance of Hammerstone, attempted to pull Miciah from his vehicle, a tactic guaranteed to escalate Miciah's anxiety and make his peaceful self-surrender impossible.

87.     Contrary to proper training Patterson unleashed his k-9 Cabo on Miciah, urging him to lunge and bite Miciah, a tactic guaranteed to escalate Miciah's anxiety and make his safe and peaceful self-surrender impossible.

88.     Because Defendants knew of Miciah's suicidal ideation and history of mental illness it was imperative Defendants at all times talk slowly and clearly in an even tone of voice with the

goal of de-escalating Miciah's anxiety and achieve a safe and peaceful self-surrender.

89.    The Defendant officers should have been trained to do the following:

- Immediately initiate a tactical plan to contain Miciah, reduce his anxiety level, and achieve a safe and peaceful self-surrender.

- Take cover behind their police cars and communicate with Miciah from a safe position without aggressive and/or loud steps that could provoke a violent response or increase Miciah's anxiety level.

- Initiate a dialogue with Miciah, talking in a low conciliatory voice to lessen his anxiety, saying things such as: They were there to help, he was no in trouble, everything would be okay and using an on the scene officer as a negotiator.

- Once a dialogue had been initiated, begin to issue instructions such as: "This is the way we are going to resolve this, here is how we are going to get you out of this," complimenting Miciah after compliance with instructions while emphasizing to Miciah he was "not in trouble."

- Utilize verbal tactics to deescalate the situation.

- Utilize Miciah's family by phone and in person to urge him to get out of the vehicle.

- Utilize less-lethal means such as tear gas, tasers and /or beanbag rounds.

- Utilize a trained crisis negotiator.

- Utilize a public address system to talk slowly and clearly to Miciah while maintain a safe distance and cover.

- Utilize a helicopter when following Miciah to avoid his anxiety at seeing a parade of police vehicles with sirens and lights.

- Utilize time, remaining in a safe covered position while attempting to talk with Miciah in a manner designed to lessen his anxiety and lead him to reasonably believe he would be safe and could peacefully self-surrender.

90.    At all times Defendants Patterson, Dejesus, Hammerstone, and Ahdunko knew Miciah Lee possessed a firearm. They did not know it was unloaded. Yet Patterson jerked open Miciah's driver's side door, saw a firearm, and became hysterical screaming in a frenzy: "He has a gun!" He has a gun!" Patterson knew Miciah had a gun. Miciah having a gun was not a surprise. Patterson had talked to Clopp about Miciah having a gun. Clopp told Patterson Miciah had a gun. Despite knowing Miciah had a gun, Patterson, in a manic frenzy, within a fraction of a second of seeing Miciah's gun, shot five rounds directly at Miciah. It was not an academy worthy performance but nevertheless Patterson clearly should not have acted surprised unless he suffers from short term memory disorder.

91.    Defendant Patterson's hyper manic conduct caused Defendant Dejesus, located opposite Patterson, at Miciah's passenger side door, to immediately fire two rounds directly at Miciah. Dejesus was not only firing at Miciah, he was also firing at Patterson and Hammerstone. In Dejesus' frenzy to shoot at Miciah, he placed the lives of Patterson and Hammerstone in danger.

92.    SPD's failure to train and supervise Defendants Patterson, Dejesus, Hammerstone, and Ahdunko caused the death of Miciah and was at all times the moving force in Miciah's death.

93.    As a direct and proximate result of SPD's failures, Miciah Lee experienced physical pain, severe emotional distress, mental anguish and eventual death during his interactions with these Defendants.

94.    The conduct alleged herein was done in reckless disregard of Miciah Lee's constitutionally protected rights; justifying an award of punitive damages as against the individually

named Defendants. SPD's failure to train Defendants Patterson, Dejesus, Hammerstone, and Ahdunko, resulted in the intentional, reckless, and callous disregard for the life of Miciah Lee and his constitutional rights. The actions of Defendants Patterson, Dejesus, Hammerstone, and Ahdunko Defendants actions were willful, wanton, oppressive, malicious, and unconscionable to any person of normal sensibilities.

95.     By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiffs were caused to incur funeral and related cremation expenses.

96.     By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, and society.

97.     Accordingly, Defendants and each of them are liable to Plaintiffs for compensatory damages.

98.     Plaintiffs seek wrongful death and survival damages under this claim.

99.     Plaintiffs also seek statutory attorney fees and costs under this claim.

## SECOND CAUSE OF ACTION
### Violation of the Americans With Disabilities Act
### As Against City of Sparks

100.     Plaintiffs reallege all prior paragraphs of this Complaint and incorporate the same herein by this reference.

101.     The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) & (2).

102.     Title II of the ADA provides: No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity. *Id.* § 12132. Discrimination includes a failure to reasonably accommodate a person's disability. To be a qualified individual with a disability a person must suffer from a physical or mental impairment that substantially limits that person's ability to perform a major life activity—an activity that the average person in the general population can perform.

103.    Title II of the ADA includes an affirmative obligation that public entities must make accommodations to people with disabilities.

104.    Title II of the ADA mandates a public entity may be liable for damages under Title II of the ADA if it intentionally or with deliberate indifference fails to provide a reasonable accommodation to a disabled person. The failure to provide reasonable accommodation constitutes discrimination against the disabled person. A public entity may not disregard the plight and distress of a disabled person by failing to accommodate his or her needs.

105.    Title II of the ADA mandates that once an entity is on notice of the need for accommodation, it is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation.

106.    Title II of the ADA applies to SPD because it is a public entity.

107.    Title II of the ADA applies to police departments.

108.    Title II of the ADA requires SPD to train its officers in how to deal with physically and mentally disabled individuals.

109.    Title II of the ADA mandates that government agencies, including police officers, must take a disabled person's disability into account by making reasonable modifications of policies and practices where needed to avoid discrimination. 42 U.S.C. Section 12132, 28 C.F.R. Section 35.130(b)(7).

110.    Miciah Lee was diagnosed in early childhood with bipolar disorder and manic depression. These mental disabilities continued throughout his life. Only months before his death Miciah was an inpatient at a juvenile mental health facility.

111.    Miciah Lee's bipolar disorder and other forms of mental illness are recognized impairments for purposes of the ADA.

112.    Miciah Lee was disabled under the ADA because his mental illness substantially limited his ability to learn, to interact with others, and to work.

113.    Miciah Lee's mental disability was at all times known to SPD and Defendants Patterson, Dejesus, Hammerstone, and Ahdunko. These Defendants either failed to follow SPD training on the accommodation of individuals with mental disabilities or were improperly trained.

114.    Defendants Patterson, Dejesus, Hammerstone, and Ahdunko knew or should have known, Miciah Lee was experiencing a severe mental health crisis. These Defendants should have known how to accommodate his mental illness by utilizing de-escalation techniques with the goal of achieving a safe and peaceful self-surrender. Yet despite this knowledge, and the national mandate to accommodate the disabled, these Defendants chose to utilize the worse possible police ractics that made a safe and peaceful self-surrender impossible.

115.    Defendants Patterson, Dejesus, Hammerstone, and Ahdunko engaged in techniques nationally understood to exacerbate and amplify stress and anxiety in the mentally ill. Such practices have long been rejected by police departments when interacting with the mentally ill. Such practices make it impossible for mentally ill persons to understand and/or to comply with directives and commands and are guaranteed to make a safe and peaceful self-surrender impossible.

116.    Defendants Patterson, Dejesus, Hammerstone, and Ahdunko. could have reasonably accommodated Miciah Lee by respecting his comfort zone, engaging in non-threatening

communications, and using the passage of time to defuse the situation rather than precipitating a deadly confrontation with an attack dog and a physical attack.

117. Defendants Patterson, Dejesus, Hammerstone, and Ahdunko had the time and opportunity to assess the situation and provide for a plan to render appropriate accommodations because Miciah Lee was contained, his vehicle was disabled, and he could not escape.

118. At all times during Defendants Patterson, Dejesus, Hammerstone, and Ahdunko's interactions with Miciah Lee, accommodation was possible. Even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the government interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill person who needs and requires accommodation for his disability.

119. At all times during Defendants Patterson, Dejesus, Hammerstone, and Ahdunko's interactions with Miciah Lee, they were on notice that because of his disability, they were required to make a greater effort to take control of the situation through less intrusive means.

120. By failing to accommodate Miciah Lee's mental health disability, Defendants acted with discriminatory intent and deliberate indifference to his federally protected rights.

121. The conduct alleged herein was done in reckless disregard of Miciah Lee's constitutionally protected rights; justifying an award of punitive damages as against the individually named Defendants.

122. By reason of the aforementioned acts and omissions, Plaintiffs were caused to incur funeral and related cremation expenses.

123. By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, and society.

124.    Accordingly, Defendants and each of them are liable to Plaintiffs for compensatory damages in an amount according to proof at trial.

125.    Plaintiffs seek wrongful death and survival damages under this claim.

126.    Plaintiffs also seek statutory attorney fees under this claim.

### THIRD CAUSE OF ACTION
### Municipal Liability—Ratification
### As Against City of Sparks

127.    Plaintiffs reallege all prior paragraphs of this Complaint and incorporate the same herein by this reference.

128.    A ratification theory may be established in two ways: 1) based on a "pattern" of ratification that constitutes a practice or custom, or (2) based on a single act by an official with policy making authority. On information and belief SPD ratifies all excessive actions of its police officers.

129.    Policymakers for City of Sparks, including but not limited to Sparks' Mayor Ron Smith, have vigorously defended the city's police officers for the shooting death of Miciah Lee.

130.    Upon information and belief, policy makers at the SPD have approved and defended the city's police officers in their conduct in the shooting death of Miciah Lee.

131.    Upon information and belief, policy makers at the SPD have a custom and practice of failing and/or refusing to discipline officers involved in officer involved shooting and excessive force cases.

132.    Upon information and belief, policy makers at the SPD have a custom and practice of improperly justifying shootings that are in fact be unjustifiable.

133.    Upon information and belief, policy makers at the SPD have failed to thoroughly investigate many of its officer involved shootings and have a custom and practice of failing to take

remedial steps after officer involved shootings.

134.   Upon information and belief, Sparks and SPD have ratified, condoned, approved, and encouraged the excessive use of force by its officers including but not limited to officer involved shootings.

135.   Sparks was deliberately indifferent to the right of Miciah Lee to be free from, and protected from, the deliberate indifference and misconduct of its employees.

136.   As a direct result of Sparks' longstanding customs and practice of deliberate indifference to the constitutional rights of disabled persons to have a safe and peaceful self-surrender, it was deliberately indifferent to a substantial risk of serious harm to Miciah Lee.

137.   As a direct result of Sparks' longstanding customs and practice of deliberate indifference to the constitutional rights of disabled persons to be accommodated by officers with a plan to de-escalate the situation with Miciah Lee so as to have a safe and peaceful self-surrender, it was deliberately indifferent to a substantial risk of serious harm to Miciah Lee.

138.   The unlawful and illegal conduct of Defendant Sparks, its policies, procedures, customs, and practices, deprived Miciah Lee of the rights, privileges and immunities secured to him by the Constitution of the United States and federal statutory law.

139.   As a direct, proximate and foreseeable result, Plaintiffs suffered damages in an amount according to proof at the time of trial.

140.   By reason of the aforementioned acts and omissions, Plaintiffs were caused to incur funeral and related cremation expenses.

141.   By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, and society.

142.   Accordingly, Defendants and each of them are liable to Plaintiffs for compensatory

damages.

143.   Plaintiffs seek wrongful death and survival damages under this claim.

144.   Plaintiffs also seek statutory attorney fees and costs under this claim.

**FOURTH CAUSE OF ACTION**
**Excessive Force—A Fourth Amendment Violation**
**Brought by The Special Co-Administrators of the Estate of Miciah Lee**
**As Against Dejesus, Patterson, Hammerstone, and Ahdunko**

145.   Plaintiffs reallege all prior paragraphs of this Complaint and incorporate the same herein by this reference.

146.   Miciah Lee was committing no crime at the time Defendants attacked him.

147.   Miciah Lee did not pose a threat to the officers' safety and was unable to and did not attempt to flee or resist arrest.

148.   The Defendant sadistic use of force was in bad faith, inflicted to cause pain and for the purpose of causing harm.

149.   The Defendants may not kill persons who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.

150.   The Defendants failed to give Miciah Lee a warning that failure to comply with commands would result in the use of deadly force.

151.   The Defendants were required to consider what other tactics, if any, were available and if there were clear, reasonable and less intrusive alternatives to force.

152.   The shooting of a mentally ill suspect without attempting less intrusive means constitutes the unreasonable use of force. The Defendants at all times had a duty to act reasonably when using deadly force.

153.   The Defendants' decision to force an entry into Lee's vehicle was in effect a decision to cause a violent and potentially deadly confrontation with a mentally ill person without a

countervailing need.

154.    Because the Defendants were on notice that Miciah Lee was a mentally ill person, they were required to make a greater effort to take control of the situation through less intrusive means.

155.    Defendants' were required to take Miciah Lee's mental health into account when considering the appropriate amount of force to be expended.

156.    Even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the government interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others but with a mentally ill individual intent on doing harm only to himself.

157.    The Defendants were armed with a 40mm less lethal firearm, there was a canine unit present, other officers had tasers. The Defendants had Miciah Lee surrounded, contained, and had established a defensive cover using police vehicles. All Defendants needed to do was use time to de-escalate the situation, working with Miciah Lee to safely and peacefully self-surrender.

158.    Defendants had no time limit and could have created a perimeter, assembled additional less lethal means, coordinated a plan for the use of force, established cover, and communicated with Miciah lee to de-escalate his anxiety and urge a safe and peaceful self-surrender.

159.    By the actions described above, Defendants deprived Miciah Lee of the well-settled constitutional right to be free from the use of excessive and unreasonable forceunder the Fourth Amendment.

160.    The right to be free from non-trivial force where there was no officer safety risk, no attempt to flee, no criminal action was clearly established. Under these circumstances, the law is

clearly established that any degree of force was unconstitutional.

161.    The officers acted together, jointly, collectively, and in concert, as integral participants, thereby ratifying, approving, and authorizing all actions of each to the other. The officers, and each of them, had a duty to intervene when their fellow officers violate the constitutional rights of a suspect or other citizen. An officer who fails to intervene when a fellow officer uses excessive force would be responsible, just as the offending fellow officer, for violating the Fourth Amendment's requirement that police may use only such force as is objectively reasonable under the circumstances.

162.    The use of deadly force was excessive and unreasonable under the circumstances, especially since Miciah Lee was mentally disabled when he was fatally shot, and posed no imminent threat of death or serious physical injury to Defendants. Defendants' actions thus deprived Miciah Lee of his right to be free from excessive force under the Fourth Amendment .

163.    The conduct of Defendants was willful, wanton, malicious and done with reckless disregard for the rights and safety of Miciah Lee and therefore warrants the imposition of exemplary and punitive damages as to the individually named Defendants only.

164.    Plaintiffs bring this claim in a representative capacity as the appointed special administrators of Miciah Lee's estate, and seeks both survival and wrongful death damages for the violation of Miciah Lee's rights.

165.    Plaintiffs also seek attorney's fees under this claim.

### FIFTH CAUSE OF ACTION
**Supervisor Liability, Violation of 42 U.S.C. § 1983, As Against Lt. Ahdunko and DOES 1-10**

166.    Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

167.    Ahdunko, as a lieutenant, was a supervisor. Ahdunko at all times possessed the

authority to restrain, control, and supervise the actions of his subordinates.

168.   Ahdunko personally participated in the constitutional violation of Miciah Lee's constitutional rights and was present when the unlawful acts transpired.

169.   Ahdunko acquiesced in the unconstitutional conduct of his officers and knowingly refused to terminate a series of acts by his subordinates, which he knew or reasonably should have known, would cause others to inflict the constitutional injuries alleged herein.

170.   Ahdunko knew or reasonably should have known that his subordinates were engaging in acts that deprived Miciah Lee of his constitutional and federal statutory rights and failed to prevent his subordinates from engaging in such conduct.

171.   Ahdunko's personal acts and his failure to supervise subordinates, caused Miciah Lee to be deprived of his rights under the laws of the United States.

172.   Ahdunko knew of the constitutional violations perpetrated against Miciah Lee and acquiesced in the unconstitutional conduct by his subordinates.

173.   Ahdunko disregarded the known or obvious consequences of his subordinates actions  in all of their interactions with Miciah Lee, including but not limited to: leaving cover, yelling, using curse words directed at Miciah using an attack dog to lunge and bite, and all actions leading up to the shooting death of Miciah Lee. Ahdunko knew or should have known that these police practices were guaranteed to raise Miciah's stress and anxiety level because of his severe mental illness, Making it impossible for him to follow police commands. Further, Ahdunko was either unaware, or deliberately indifferent, to nationally recognized standards.

174.   Ahdunko's conduct was so closely related to the deprivation of Miciah Lee's rights as to be the moving force that caused Miciah Lee's injury.

175.   Ahdunko was deliberately indifferent to the deprivation of Miciah Lee's constitutional rights. For example, Ahdunko's failures are evident in that he allowed Dejesus to approach the passenger side door and fire directly into the path of Patterson and Hammerstone.

176.   As a direct and proximate result of the aforedescribed willful and unlawful conduct by Ahdunko, committed under color of law and under his police authority, Miciah Lee suffered

substantial physical pain, emotional distress, and death.

177.    The conduct alleged herein caused Miciah Lee to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably, and actually caused Miciah Lee to suffer emotional distress, pain and death.

178.    The conduct alleged herein was done in deliberate or reckless disregard of Miciah Lee's constitutionally protected rights; justifying the award of punitive damages against the individually named Defendants.

**SIXTH CAUSE OF ACTION**
**Deprivation of Right to Familial Relationship—A 14th Amendment Violation**
**As Against All Individual Defendant**

179.    Plaintiffs reallege all prior paragraphs of this Complaint and incorporate the same herein by this reference.

180.    Clopp and Fridge, as parents, have a fundamental liberty interest in the companionship and society of his or her child and the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983.

181.    This constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents.

182.    The conduct of the individually named Defendants shocks the conscience because actual deliberation by the Defendants was practical.

183.    After Miciah Lee crashed into the median on McCarren Blvd. he was in a confined space, unable to escape, sitting in a disabled vehicle, and surrounded by multiple officers. It shocks the conscience that with ample time and opportunity to consider the consequences of Miciah's disability and obvious mental health crisis, Defendants rush to kill Miciah in a frenzy of hysteria because he "had a gun" when at all times they knew he had a gun.

184.    The aforementioned acts and or omissions of Defendants were in deliberate

indifference to Miciah Lee's disability, thereby violating his civil rights.

185.   The deprivation of the rights alleged above has destroyed the Constitutional rights of Clopp and Fridge to the society and companionship of their son which is protected by the substantive due process clause of the Fourteenth Amendment

186.   The conduct alleged herein violated Miciah Lee's rights alleged above thereby resulting in the deprivation of Clopp and Fridge's rights which has legally, proximately, foreseeably, and actually caused both parents to suffer emotional distress, pain and suffering, and further damages according to proof at the time of trial.

## SEVENTH CAUSE OF ACTION
### Wrongful Death
### Brought by Clopp and Fridge Individually As Against All Defendants

187.   Plaintiffs reallege all prior paragraphs of this Complaint and incorporate the same herein by this reference.

188.   Miciah Lee's heirs pursuant to NRS 134.050(3) are: His mother, Susan Clopp, and his father, Paris Fridge.

189.   Miciah Lee's heirs have, by reason of Miciah Lee's death and pursuant to NRS 41.085(4) suffered pecuniary loss and expenses related to the death of Miciah Lee.

190.   Miciah Lee's heirs have, by reason of Miciah Lee's death, suffered extraordinary physical and emotional pain in the form of grief and sorrow, loss of probable support, companionship, society, comfort and consortium.

## EIGHTH CAUSE OF ACTION
### Survival Action
### Brought by the Estate of Miciah Lee As Against All Defendants

191.   Plaintiffs reallege all prior paragraphs of this Complaint and incorporate the same herein by this reference.

192.    Miciah Lee was unable to bring an action against Defendants for damages for the injuries causing his death during his lifetime.

193.    Miciah Lee's estate pursuant to NRS 41.085(5) may recover any special damages which Miciah Lee incurred or sustained before his death, and funeral expenses. The estate may also pursue any penalties, including but not limited to, exemplary or punitive damages Miciah Lee would have recovered if he had lived. The estate is also entitled to the damages Miciah Lee could have recovered if he had not died, including pain and suffering.

### NINTH CAUSE OF ACTION
**Negligence**
**As Against All Defendants**

194.    Plaintiffs reallege all prior paragraphs of this Complaint and incorporate the same herein by this reference.

195.    The actions and inactions of the Defendants were negligent and reckless, including but not limited to:

(a) The failure to properly and adequately develop a plan to approach Miciah Lee with the goal of obtaining a safe and peaceful self-surrender.

(b) The failure to properly and adequately assess how to accommodate Miciah Lee who was obviously in a mental health crisis when they knew he was mentally ill.

(c) The negligent tactics and handling of the situation with Miciah Lee, including excessive shooting while he was seated in his car, silent, and making no threatening gestures.

(d) The negligent failure to make any accommodation for Miciah Lee's disability and mental illness.

(e) The negligent failure to develop a plan to de-escalate the situation so that Miciah

Lee could be safely removed from his vehicle.

(f)  The negligent use of deadly force, including the negligent use of handguns.

(g)  The failure to properly train and supervise employees.

(h)  The failure to provide verbal warnings prior to shooting.

196.  As a direct and proximate result of defendants' conduct  as alleged above, and other undiscovered negligent conduct, Miciah Lee was caused to suffer severe pain and suffering and ultimately died. Also as a direct and proximate of Defendants' conduct as alleged above, Plaintiffs suffered extreme and severe mental anguish and pain and have been injured in mind and body. Plaintiffs also have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of Miciah Lee, and will continue to be so deprived for the remainder of their natural lives. Plaintiffs are also claiming funeral and burial expenses.

197.  Plaintiffs are also seeking wrongful death damages and survival damages under this claim.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.  Issue a judgment declaring that the actions of Defendants described herein are unlawful and violate Plaintiffs' rights under the constitution and laws of the United States;

2.  For general and hedonic damages in a sum according to proof;

3.  For special damages in a sum according to proof;

4.  For punitive damages in a sum according to proof;

5.  For leave to amend or supplement the Complaint when the identity of the DOE Defendants is discovered and new evidence is uncovered;

6.  For declaratory relief;

7.  For reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

8.  For cost of suit herein incurred; and,

9.  For such other and further relief as the Court deems just and proper.

Dated :This ___ day of August 2020


/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
PETER GOLDSTEIN
*Attorneys for Plaintiffs Clopp and Fridge*