UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SUSAN LYNN CLOPP, *et al.*,

                                    Plaintiff,

        v.

CITY OF SPARKS, *et al.*,

                                    Defendant.

Case No. 3:20-cv-00465-MMD-CSD

ORDER

## I.    SUMMARY

On the evening of January 5, 2020, police officers shot and killed Miciah Lee—an eighteen-year-old, African-American man with a history of mental illness—in Sparks, Nevada. Bringing this action are Plaintiffs Susan Clopp and Paris Fridge, both as co-special administrators of Lee's estate and in their individual capacities as Lee's mother and father, respectively. Plaintiffs collectively bring nine claims against Defendants City of Sparks ("City") and Sparks Police Department officers Ryan Patterson, Eric Dejesus, James Hammerstone, and James Ahdunko (collectively, "Officers"). Before the Court are two motions: Plaintiffs' motion for partial summary judgment (ECF No. 78)[1] and Defendants' motion for summary judgment (ECF No. 83).[2] As explained further below, the Court will deny Plaintiffs' motion and will deny Defendants' motion on all but Plaintiffs' negligence claim.

---

[1]Plaintiffs filed most of their exhibits separately (ECF No. 79), and they filed an errata to their motion (ECF No. 88) that corrected a minor error misidentifying two non-parties. The Court has reviewed the parties' notices of manual filing (ECF Nos. 80, 92). Defendants responded (ECF No. 90) to the motion and Plaintiffs replied (ECF No. 94).

[2]Defendants supplemented their motion with a declaration from Defendants' counsel. (ECF No. 84.) Plaintiffs responded (ECF Nos. 89, 91 (additional exhibits)) to the motion and Defendants replied (ECF No. 95). The Court also has reviewed the parties' notices of manual filing (ECF Nos. 85, 93).

## II.      BACKGROUND

Following Lee's death, Lee's parents now assert claims on his behalf. The Court highlights only the most salient details concerning the events of the evening in question, Lee's mental health history, the Officers' training, and the City's policies.[3]

### A.      Sparks Police Department's Policies

Sparks Police Department ("SPD") issues General Orders that document policies by which its officers are bound to comply. Two General Orders are relevant to this litigation: General Order DM 7.1, which establishes criteria and procedures for the Crisis Intervention Team ("CIT"), and General Order DM 9.1, which governs SPD officers' use of force. (ECF No. 79-4 at 7-21.)

DM 7.1 provides that some SPD officers are specially trained to carry out SPD's policy "to handle incidents involving mentally ill persons and those in crisis with care and expertise, ensuring that such persons receive appropriate responses based on their needs." (*Id.* at 19.) These officers, known as CIT officers, are "on-duty, uniformed Patrol Division Officers and Detectives, who have received specialized training and been certified in crisis intervention." (*Id.*) DM 7.1 establishes guidelines and procedures for CIT officers. (*Id.*) SPD specifically trains CIT officers to "[i]nteract with persons who are mentally ill or in crisis . . . when violent, and those with developmental disabilities", to "[d]e-escalate crisis events and mitigate potentially violent outcomes when possible," and to "[u]tilize the resources and services available to those with mental illness." (*Id.*)

DM 7.1 governs situations in which an SPD officer is aware of a situation that would benefit from a CIT officer. (*Id.*) These situations—called "criteria" under the policy—requiring the dispatch of CIT officers include "[e]vents involving persons threatening suicide under violent/volatile circumstances, *e.g.*, [the] person is armed and threatening/holding [a] weapon/firearm/other instrument," and "[d]isturbances involving persons known to have reported or diagnosed mental illnesses, *e.g.*, domestic events

---

[3]Unless otherwise noted, the following facts are undisputed.

reported by family members [and] crimes involving mentally-ill persons." (*Id.* at 19-20.) Procedurally, SPD will dispatch CIT officers where "[c]ommunications receives a call for service meeting [the] criteria for dispatch of [a] CIT officer," or where "an officer goes to a call and determines that it meets the criteria to dispatch a CIT officer." (*Id.* at 20.) When satisfied that an encounter meets these CIT "criteria," "[t]he officer should make contact with the CIT officer even before the CIT officer's arrival on scene, if possible, to explain the situation and coordinate tactics." (*Id.*)

Additionally, DM 9.1 governs all SPD officers' uses of force, whether deadly or non-deadly force. (*Id.* at 7-17.) Per section 9.1.01, officers "shall use compliance techniques in accordance with constitutional law, the Nevada Revised Statutes, their Nevada P.O.S.T. certified training or Department approved training":

> The use of deadly or non-deadly force is restricted to the purposes of self protection, the protection of others, to compel compliance with a lawful order, to prevent the escape of a dangerous offender, per Tennessee v. Garner, 471 US 1 (1985) or to take an offender into custody.

(*Id.* at 8.) Officers "shall use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training wherever possible and appropriate before resorting to force and to reduce the need for force." (*Id.* at 9.)

If an "officer involved shooting" occurs despite de-escalation attempts, the involved officer's supervisors must "respond in accordance with the Officer Involved Shooting Protocol." (*Id.* at 17.) As part of the required response, and after completion of a post-shooting criminal investigation, "the Internal Affairs Lieutenant will complete an administrative review of the officer involved shooting." (*Id.*) This internal administrative review "will include background information about the shooting, an overview of the investigation and an analysis of applicable policies." (*Id.*)

### B.    The Officers' Training and Disciplinary History

None of the Defendant Officers were trained CIT officers at the time of the incident. However, two other SPD officers, Officers Bader and Wisneski, were CIT officers on duty the evening of January 5, 2020. Bader and Wisneski arrived at the initial

scene and spoke with Clopp, Lee's mother, shortly after Clopp's 911 call and after Lee left the initial premises.[4] (ECF No. 78 at 4.)

In 2019, SPD provided one state-approved, crisis-intervention training—a "[c]ondensed CIT class"—which involved a PowerPoint presentation and taught SPD officers how to "deal[ ] with the mentally ill" as well as de-escalation techniques, such as (1) establishing a rapport to calm an agitated mentally ill person, (3) speaking calmly, slowly, and clearly without cursing, and (3) avoiding "sudden movements" and "distractions" like "noise, barking [police] dogs, lights, [and] sirens," if possible. (ECF Nos. 78-8 at 15-21, 33, 83-20 at 44.) According to Defendants' expert witness Jack Ryan, SPD provided "further de-escalation training in 2020" through an online platform, which occurred after the January 5, 2020 incident. (ECF No. 83-20 at 44.)

Despite these trainings and the initial presence of CIT officers, Officer James Hammerstone acknowledged that it was SPD's practice to not call for CIT officers—even if required under DM 7.1—and that neither he nor any other officer he knew had called for CIT throughout his 16-year career at SPD. (ECF No. 89-8 at 7-8.)

**C.    Lee's Childhood & Mental Health History**

Mental illness, abuse, and drug use punctuate Lee's childhood and first months of adulthood. Born in 2001, Lee was initially raised by Clopp, his mother, in Reno, Nevada, until age nine.[5] At age nine, Lee was hospitalized at West Hills Behavioral Health

---

[4]Plaintiffs allege that CIT-trained Officers Wisneski and Bader "were not called" to the scene, even though they were on duty the evening of the January 5, 2020 incident. (ECF No. 78 at 4.) Rather, Plaintiffs allege, Wisneski and Bader "arrived on their own after Lee's death." (*Id.*) In his deposition, former SPD Chief Peter Krall states he was not sure whether Bader and Wisneski were available at the time of Clopp's 911 call, but acknowledged that the incident involving Lee was of the sort that would "[p]otentially" require dispatching CIT officers under SPD policy. (ECF No. 78-5 at 33-34.) Regardless, the timestamps on Bader's body cam footage indicate that Bader and Wisneski arrived at the initial scene and spoke with Clopp just six minutes *before* the Officers shot and killed Lee. (ECF No. 90-17 at 5:58-7:27.)

[5]Clopp temporarily lost custody of Lee in 2006, when Lee was five years old, after her ex-boyfriend had physically abused Lee. (ECF Nos. 83-1 at 10, 89-2 at 4.) Clopp was thereafter charged with child abuse for this incident, and she eventually pleaded guilty to child neglect. (ECF No. 83-1 at 10.)

Hospital after "threaten[ing] to kill himself," punching and biting Clopp, and threatening to "slit [Clopp's] throat in [her] sleep." (ECF Nos. 83-4 at 4, 89-2 at 2, 4.) While hospitalized, medical providers diagnosed Lee with bipolar disorder and attention deficit hyperactive disorder ("ADHD"), and identified several "risk factors," such as "learning disabilities," "self-harm/suicide," "violence/aggression," and a family history of bipolar disorder. (ECF No. 89-2 at 2, 8.) By nine years old, Lee had already begun drinking alcohol and smoking cigarettes. (ECF Nos. 83-4 at 3, 89-2 at 7.)

Upon release from West Hills, Lee began medication and counseling to treat his diagnoses. (ECF No. 89-2 at 6-7.) However, he soon stopped medication after moving to Colorado to live with Fridge, Lee's father, from ages 10 to 16. (ECF Nos. 83-4 at 4, 89-2 at 7.) While in Colorado, Fridge repeatedly beat and verbally abused Lee. (ECF Nos. 83-4 at 4, 89-2 at 7.) During this time, at age 13, Lee attempted suicide by overdosing on pills. (ECF No. 83-4 at 4.) At age 16, Lee left Colorado to go live with his paternal grandmother in Mississippi for a few months, and then returned to Northern Nevada to live with a family friend—Lee's temporary guardian—in Winnemucca. (ECF No. 83-2 at 13-14.) Around March 2019, at age 17, Lee left Winnemucca and returned to Reno. (ECF No. 89-2 at 6.) There, Lee was either unhoused or otherwise transient, "typically spending nights with friends," and he began using methamphetamine, marijuana, and heroin, among other drugs. (ECF Nos. 83-4 at 3, 89-2 at 6.) Around this time, Lee was also arrested and detained in Reno after attempting to burglarize a convenience store in efforts to support his heroin use. (ECF No. 83-4 at 3.)

While in juvenile detention, Lee remained sober and underwent a psychiatric evaluation on May 1, 2019, which resulted in several "diagnostic impressions," including post-traumatic stress disorder ("PTSD"), "bipolar mood disorder," ADHD, substance abuse disorder, and "antisocial personality traits."[6] (ECF No. 89-2 at 9.) On May 13,

---

[6]The psychiatrist conducting this evaluation based Lee's bipolar disorder and ADHD diagnoses on his previous medical history, including at West Hills, as well as interviews and psychological testing during the evaluation itself. (ECF No. 89-2 at 9.)

2019, Lee left juvenile detention and was subject to group home supervision and weekly drug testing as part of probation and parole. (ECF No. 83-4 at 2-3.) On May 16, 2019, days after his 18th birthday, Lee underwent a second psychiatric evaluation with the Northern Nevada Adult Mental Health Services as a condition of his probation. (*See generally id.*) During this second evaluation, Lee told the psychiatric nurse, "I have bipolar disorder [ ] and ADHD, but those pills kill your body so I would rather learn to cope with it than rely on a pill." (*Id.* at 2.) Lee also expressed his desire to "maintain sobriety from [h]eroin and meth," "establish some independent living skills," and "finish his [high school] education and find work." (*Id.* at 6.) Though the psychiatric nurse deemed Lee's previous evaluation "reliable," she concluded that "Bipolar II disorder" was ruled out ("R/O") because "[Lee] really doesn't meet criteria for Bipolar disorder at this time," and "his mood is stable off drugs/alcohol." (*Id.* at 3, 6.) Instead, the nurse made the following diagnoses: "[u]nspecified mood (affective) disorder," severe "[h]eroin use disorder," severe "[c]annabis use disorder," and mild "[a]mphetamine-type substance use disorder." (*Id.* at 6.) Lee's "initial treatment plan" recommended "no medications . . . at this time," counseling, and continued sobriety. (*Id.*)

During his last months of life, and up until the incident, Lee remained transient and began staying with Clopp in her Sparks apartment. (ECF No. 83-11 at 7:49-7:57.)

**D.    The Incident: January 5, 2020**

Most of the events giving rise to Plaintiffs' claims occurred within a 16-minute window on the evening of January 5, 2020, as recounted below.

**1.    The Initial 911 Call**

Around 5:30 PM, when leaving work, Clopp received a phone call from one of her sons, who told her to come home quickly because Lee had a gun and had told his brothers that "he was going to kill himself." (ECF No. 83-1 at 52.) Clopp soon thereafter arrived at her apartment complex and found Lee, who had locked himself inside a family friend's car he had been using, parked in front of a nearby business. (*Id.* at 52-53.) Through an open car window, Clopp tried talking to Lee and observed his "blank stare"

as he held a gun in his lap. (*Id.* at 53.) According to Clopp, Lee was "paranoid" and believed that the police or someone else were actively pursuing him. (*Id.* at 52.) Suspecting severe mental health issues at play, Clopp and two of Lee's brothers stood around the car and tried preventing Lee from leaving the premises. (*Id.* at 54.) Lee grew agitated, "[p]unching the steering wheel" and telling Clopp and his brothers "to get the F out of the way." (*Id.*)

At 5:48 PM, after attempting de-escalation and calling her boyfriend and Lee's grandmother for advice, Clopp resorted to calling 911. (*Id.* at 54-55.) While standing in front of the car, where Lee remained locked inside, Clopp repeatedly told dispatch Lee was armed, "mentally unstable," and suicidal, and had "a history of drug use":

My son has a gun in the car. He's trying to leave, and he's saying he's going to kill himself. He's mentally unstable, and he said he's going to die by cop or by himself . . . We're trying to stop him . . . He's mentally unstable . . . He thinks he's wanted by you guys and he's leaving. I don't know what to do . . . He said he's going to kill himself either by you guys or by himself . . . He's mentally unstable, sir. He's been—when he was younger, he was committed by me . . . He's a manic depressive and bipolar . . . [He has] a handgun; I don't know where he got the gun from. And he has a history of drug use . . . He was diagnosed at West Hills [Behavioral Health Hospital] when he was younger.

(ECF No. 83-9 at 0:06-3:54, 6:38-6:48.) As for Lee's prior mental health diagnoses, Clopp noted he had briefly taken medication for his bipolar disorder after discharge from West Hills, but soon stopped taking the medication after moving in with Fridge. Lee had not taken medication since then, even though medical providers "ha[d] always recommended it." (*Id.* at 6:50-7:10.) Clopp also informed dispatch that SPD "knows all [of Lee's] information" because he had been "a wanted fugitive less than a year ago" as "a runaway" and "missing" minor, and that Lee was "only 18." (*Id.* at 3:58-4:07.) During the 911 call, dispatch broadcasted these facts to SPD officers. (ECF Nos. 83 at 6, 83-9 at 2:36-2:40.)

At 5:53 PM, CIT officers Bader and Wisneski located and spoke with Clopp, about five minutes after she had initiated the 911 call.[7] Visibly distressed and crying, Clopp informed Bader and Wisneski that Lee was 18 years old, "mentally unstable since he was a baby," suicidal, "ha[d] a history of drug use," and was driving a family friend's car with a gun on him. (ECF No. 83-11 at 6:34-7:34.)

## 2.   Defendant Officers' First Encounter with Lee

While Bader and Wisneski questioned Clopp, Officer Ryan Patterson was called to locate Lee, who had just driven off from where Clopp and her sons had tried to de-escalate the situation. SPD dispatch informed Patterson that Lee was "bipolar" and driving a car "by himself." (ECF No. 83-14 at 1:18-1:21, 1:36-1:46.) Soon thereafter, at 5:58 PM, Patterson first located Clopp, Bader, and Wisneski. Patterson approached and asked Clopp where Lee had gone. (*Id.* at 6:31-6:32.) Crying, Clopp noted the direction in which Lee had driven off, identified the family friend's car he was driving, and warned Patterson that Lee "ha[d] a gun and said he was going to die by cop or by suicide." (*Id.* at 6:34-6:45.) In turn, Patterson communicated to other SPD officers that Lee was "possibly suicidal by cop." (*Id.* at 6:46-6:54.)

At 6:01 PM, Patterson located Lee in the car described by Clopp, only a few blocks from where he had driven off. Lee appeared to have spotted Patterson and then sped up after turning onto a residential side street. (*Id.* at 9:48-10:30.) With lights and sirens activated, Patterson pursued Lee for over one minute, until Lee hit the back bumper of another driver, who had stopped at a stop sign at a three-way intersection ("Initial Crash Site"). (*Id.* at 10:33-11:02.) Patterson then wedged and blocked Lee from behind, sandwiching Lee's car in between Patterson's patrol vehicle (from behind) and the other driver's car (in front). (ECF Nos. 83-5 at 36, 83-14 at 11:00-11:02.) Patterson quickly exited his patrol vehicle, pointed his gun toward the driver side of Lee's car, and,

---

[7]As previously noted, it remains unclear—and perhaps disputed—whether CIT-trained officers Bader and Wisneski arrived at the initial scene on their own to speak with Clopp. Plaintiffs allege that Bader and Wisneski "were not called" to the scene, even though they were on duty the evening of the incident. (ECF No. 78 at 4.)

shouting, ordered Lee to "stick [his] hands up right now" and "get out of the car." (ECF No. 83-14 at 11:02-11:0.) Lee remained in the car, but he began accelerating and spinning his tires in place as the car pushed into the back bumper of the other driver in front of him. (*Id.* at 11:11-11:22.) As Lee's tires spun, Patterson requested a 40-millimeter less-lethal foam shoulder launcher from fellow officers to bust out Lee's windows. (*Id.* at 11:18-11:21.) Within these few seconds, Patterson also instructed another officer to block the stationary vehicle in front of Lee and to evacuate its driver. (*Id.* at 11:10-11:34.) By this point, the three other Defendant Officers—Hammerstone, Ahdunko, and Dejesus—had also arrived at the Initial Crash Site to assist.

Lee continued spinning his tires in efforts to free himself from between both vehicles. (*Id.* at 11:34-11:50.) "Hey, get out of the car right now; let me see your fucking hands," Patterson shouted, as he stepped closer to Lee's car with his gun drawn. (*Id.* at 11:37-11:40.) Meanwhile, Lieutenant James Ahdunko, also present at the scene, blocked off traffic with his patrol vehicle and instructed Hammerstone to use a 40-millimeter launcher to shoot out Lee's front window.[8] (ECF No. 83-6 at 10.) Patterson hoped that shattering the window would allow his K-9 service dog to enter Lee's vehicle, disrupt his actions, and give the Officers more time to restrain him. (ECF No. 83-23 at 22.) Hammerstone obeyed Ahdunko's orders and shot multiple 40-millimeter rounds at Lee's front driver side window, near Lee's head. (ECF No. 83-15 at 12:05-12:38.) Eventually, Hammerstone successfully hit Lee's window, but instead of shattering it completely, he only made "a small hole in the window." (ECF Nos. 83-6 at 11, 83-15 at 12:36-12:38.) Despite the Officers' efforts, Lee successfully maneuvered out of Patterson's vehicular block and drove off. (ECF Nos. 83-14 at 12:02-12:05, 83-15 at

---

[8]Plaintiffs dispute whether Ahdunko was effectively in charge during this initial encounter, arguing that Patterson "immediately placed himself in charge." (ECF No. 89 at 3.) Plaintiffs cite Patterson's deposition testimony, wherein Patterson stated he had found himself to be the primary officer in charge because he had initially located Lee, had attempted to perform a traffic stop, and had (temporarily) boxed in Lee's car at the Initial Crash Site. (ECF No. 89-4 at 12.) But Patterson also acknowledged Ahdunko's role in blocking traffic at intersections to facilitate the Officers' pursuit. (*Id.*)

12:38-12:40.) The Officers quickly returned to their patrol vehicles and gave chase. (ECF No. 83-14 at 12:05-12:15.)

### 3.    The Fatal Encounter

With the Officers in pursuit, Lee drove at least 70 miles per hour in a residential, 25-mile-per-hour zone. (ECF Nos. 78 at 7, 83 at 5, 83-5 at 44, 83-8 at 24.) As the "lead vehicle" behind Lee, Ahdunko eventually slowed down to stop traffic at a major intersection and to facilitate the Officers' pursuit. (ECF No. 83-8 at 24) Just past this intersection, however, Lee lost control of the vehicle, crashed into a brick wall bordering the road, ricocheted off the wall, and eventually stopped on top of a curbed median in the middle of the road ("Final Crash Site"). (ECF Nos. 79-12 at 4, 83-8 at 24.) After crashing into the brick wall, Lee's front passenger wheel had detached itself from the car's axle and lodged itself beneath the undercarriage.[9] (ECF No. 83-23 at 4.) The pursuit between the Initial Crash Site and the Final Crash Site lasted about 70 seconds. (ECF No. 83-14 at 12:05-13:15.)

Arriving first to the Final Crash Site, Patterson and Hammerstone maneuvered their patrol vehicles to "block in" and immobilize Lee's car. (ECF Nos. 83 at 6, 83-14 at 13:19-13:21, 83-15 at 13:58-14:02.) Hammerstone tried blocking the car's front, while Patterson handled the rear. (*Id.*) Patterson exited immediately after stopping, drew his

---

[9]The parties dispute whether the Officers knew that Lee's front passenger wheel had broken off and, as a result, whether Lee was immobile or remained a flight risk. (ECF Nos. 83 at 6 & n.2, 89 at 4.) Plaintiffs argue that Patterson "saw immediately" that Lee's car was "not moving" and "not driveable." (ECF No. 89 at 4.) Defendants acknowledge that "[t]he passenger side show[ed] significant damage," but assert that "this side of the vehicle was never visible to the officers prior to the shooting." (ECF No. 83 at 6 n.2.) Because the Officers approached Lee's car from the driver side, they argue, they "had no reason to suspect [Lee's vehicle] was immobile." (*Id.* at 6.) Defendants explain that all Officers remained on the driver side "because it would cause a crossfire situation." (*Id.*) Indeed, body cam footage for Patterson and Hammerstone show that they initially approached Lee's driver side, where the broken wheel was not visible. (ECF Nos. 83-14 at 13:19-13:23, 83-15 at 13:58-14:07.) But Dejesus's body cam footage shows that he initially approached Lee's car from the rear, with his gun drawn, and then moved to the passenger side, where he may have seen the broken wheel seconds before shooting Lee. (ECF No. 83-12 at 12:20-12:31.) As explained below, there is a genuine issue of material fact as to whether the Officers knew upon arrival that Lee was no longer a flight risk due to the broken wheel.

gun, and shouted three times, "let me see your fucking hands," as he approached Lee's driver side. (ECF No. 83-14 at 13:17-13:25.) Despite Patterson's orders, Lee remained in the car. (*Id.*) Patterson then went back to his patrol vehicle to retrieve his K-9 service dog. (*Id.* at 13:26-13:30.) At this time, Patterson also instructed Hammerstone to open Lee's front driver side door. (ECF Nos. 83-14 at 13:28-13:29, 83-15 at 14:04-14:09.) Hammerstone complied and opened the front driver side door to reveal and access Lee, who was slightly hunched over in the driver's seat, with arms crossed and only his right hand and left bicep clearly visible. (*Id.* at 13:32-13:35.)

Despite drawn guns and multiple commands, Lee remained silent, looked at Hammerstone, who had just opened the car door, and then looked at Patterson. (*Id.* at 13:34-13:36.) As Patterson ordered Lee—for the fourth time—to show his hands, he deployed his service dog upon Lee, which bit and latched onto Lee's left arm. (*Id.* at 13:36.) As Lee quietly struggled with the dog on his arm, Patterson leaned into the car to extract Lee. (*Id.* at 13:37-13:39.) Patterson then saw Lee's handgun in his lap and yelled twice, "he's got a gun!" (*Id.* at 13:40-13:44.) At the same time, however, Hammerstone yelled three times to Patterson, "I've got hands!" (ECF No. 83-15 at 14:16-14:18.) After Hammerstone's communication that Lee's hands were in fact visible, Patterson retreated, pulled his gun from his holster, and shot at Lee five times. (ECF Nos. 83 at 7, 83-14 at 13:44-13:46.) Dejesus, who had since moved to Lee's passenger side, also fired two shots at Lee—through the front passenger window and potentially causing crossfire—because he had "perceived that [Lee] was firing at Patterson" and that a "gunfight" had ensued. (ECF Nos. 83 at 7, 83-7 at 35, 83-12 at 12:36-12:38.) After Patterson and Dejesus fired their shots, Lee's body went still, with his head and left arm hanging out of the open car door. (ECF Nos. 83-14 at 13:47-13:56, 83-15 at 14:20-14:22.)

### 4.    Post-Shooting Response

Mere seconds after firing, Patterson explained to the other Officers that Lee "was reaching for his gun." (*Id.* at 13:54-13:55.) Four minutes after the shooting, at 6:09 PM,

the medics arrived and pronounced Lee dead. (ECF Nos. 79-12 at 4, 83-23 at 13.) During the post-shooting search of the Final Crash Site, SPD officers found Lee's handgun tucked between his legs, with the barrel pointed toward the ground and only the butt and magazine visible.[10] (ECF No. 79-12 at 5.)

### 5.    The Autopsy

Washoe County Chief Medical Examiner Dr. Laura Knight performed an autopsy on Lee's body on January 6, 2020. (ECF No. 83-23 at 46.) Dr. Knight recorded six gunshot wounds to the head and neck, left upper back, and the right hip and thigh. (*Id.*) Dr. Knight determined that Lee's cause of death was "multiple gunshot wounds," and that the manner of death was homicide. (*Id.*) Lastly, Dr. Knight noted the presence of alcohol and marijuana at levels above the state legal limits to operate a motor vehicle. (*Id.* at 42 & n.3.)

### 6.    Investigation and Follow-Up

The Reno Police Department ("RPD") investigated the incident as part of a criminal investigation led by the Washoe County District Attorney's ("DA") Office. (ECF Nos. 83 at 8, 83-23 at 7-8, 83-22 at 5.) RPD detectives interviewed Patterson on January 6, 2020, about six hours after the incident. (ECF No. 83-23 at 20-23.) The detectives also interviewed Dejesus, Hammerstone, and Ahdunko, among other witnesses. (*Id.* at 23-25.)

In his interview, Patterson told detectives he had heard a call "regarding a mother's suicidal son with a gun," to which he responded with lights and sirens activated because he found the situation "concerning." (*Id.* at 21.) When Patterson located Clopp right after her 911 call, he thought Clopp was "pretty frantic," and he heard Clopp say that Lee was "suicidal by cop." (*Id.*) Patterson also clarified that, to him, "suicidal by cop" means that a subject plans to "engage an officer in a way to make us use lethal force" by doing something "that's life threatening." (*Id.*) By the time Patterson initially located Lee,

---

[10]In the post-shooting criminal investigation, the DA ultimately determined that Lee's handgun was "unloaded." (ECF No. 83-23 at 51.)

Patterson explained to the detectives that he had grown "concerned" due to the nature of the call and the uncertainty of Lee's mental state. (*Id.*) Specifically, Patterson worried that Lee would be "crazy enough to like drive into other people," and that he could potentially encounter police officers from a different agency. (*Id.*) Based on these concerns, Patterson explained, he decided to perform a traffic stop on Lee. (*Id.*)

Once Lee and the Officers all arrived at the Final Crash Site, Patterson recalled having exited his vehicle with his gun drawn, and that he had directed Hammerstone to open Lee's driver-side door to enable Patterson's use of his K-9 service dog. (*Id.* at 22.) Patterson also told detectives that once Hammerstone opened the driver side door, he could not see Lee's left hand, but that "his right hand was partially hidden." (*Id.*) After giving the K-9 service dog the "bite command," Patterson then attempted to pull Lee out of the car. While physically struggling with Lee, Patterson reported looking down and seeing Lee's handgun, "pointing towards Lee's crotch with the handle pointing up." (*Id.* at 23.) Patterson told detectives that Lee's handgun "was in a position where if [Lee] were to reach down and grab it, it would be easy for [Lee] to point it at [Patterson] or someone else or him." (*Id.*) To Patterson, it was "a perfect time to try and grab it" because his service dog was "on the bite." (Id.) Although Lee did not strongly react to the K-9 police service dog's bite, he did react to Patterson's physical contact, which led Patterson to believe that Lee was capable of killing Patterson, himself, or other Officers:

> [Lee] like slumped . . . slouche[d] over, like his arm shoots this way and I don't even remember getting ahold of the gun at all . . . so I yell out, 'He's got a gun! He's got a gun,' and when [Lee] went for [his own gun] and I wasn't able to grab [his gun], I'm like okay, well this isn't a fight that I even wanna try and win. He's already threatened suicide by cop and I felt like he was gonna freaking kill me, the way like . . . he was so committed. He didn't even say anything when my dog was on the bite, he didn't react at all and he immediately reacted to me going for the gun.

(*Id.*)

In his deposition, Patterson later stated that if he were again "in that moment in time during this circumstance," he would act the same way he did during the January 5, 2020 incident. (ECF No. 83-5 at 73-74.) Patterson also acknowledged that he had

placed his own life and Hammerstone's life in danger when he instructed Hammerstone to open Lee's front driver side door, knowing Lee was armed. (*Id.* at 75.)

RPD detectives also interviewed Dejesus. (ECF No 83-23 at 18-20.) Dejesus recalled responding to dispatch's alert about Clopp's 911 call and hearing that Lee was armed and threatening "suicide by cop." (*Id.*) Dejesus explained that, once at the Final Crash Site, he had drawn his gun and approached Lee's vehicle because Lee (1) was armed, (2) had already fled from the Officers, (3) had previously crashed into another car, (4) had not complied with the Officers' commands, and (5) put lives in danger through his erratic driving. (*Id.*) While Patterson was "wrestling" with Lee, Dejesus attempted to open the front passenger side door, but it was locked. (*Id.*) Dejesus then heard Patterson yell multiple times that Lee had a gun as well as multiple gunshots. (*Id.* at 20.) Dejesus told detectives he had thought the gunshots had come from Lee, and that Lee was the one shooting at Patterson. (Id.) In response, Dejesus fired two rounds at Lee through the front passenger window. (*Id.*)

In his post-shooting interview with detectives, Hammerstone explained his role in responding to the January 5, 2020 incident. (*Id.* at 23-24.) After learning that Patterson had located Lee and began pursuing him, Hammerstone followed them until Lee hit the stationary driver and got boxed in at the Initial Crash Site. (*Id.* at 24.) There, Hammerstone stopped in a position perpendicular to Lee's vehicle, facing the car's driver side. (*Id.*) Hammerstone exited his patrol vehicle and followed Ahdunko's order to use a 40-millimeter less-lethal foam launcher to shoot out Lee's front driver side window. (*Id.*) Hammerstone confirmed that he had only "punched a hole" in the window instead of shattering it as planned. (*Id.*)

After Lee had briefly escaped and subsequently crashed at the Final Crash Site, Hammerstone exited his vehicle with his gun drawn and followed Patterson's instruction to open Lee's front driver side door. (*Id.*) With the door now open, Hammerstone noticed "Lee's right hand underneath his legs," which remained "down," even as Patterson tried

14

to physically remove Lee from the vehicle. (*Id.*) Hammerstone kept his gun aimed at Lee for this reason. (*Id.*)

In June 2020, the DA concluded its investigation and determined that the Officers' actions were justified under Nevada law, thereafter closing the criminal case. (*Id.* at 51.)

In July 2020, local activists mobilized around Lee's death and demanded law enforcement reform—part of nationwide protests to "defund the police," linking police brutality and race, following the police killing of George Floyd in Minneapolis. (ECF No. 91-18 at 22.) In response to such calls for reform and accountability at a Sparks City Council meeting, former Sparks mayor Geno Martini and then-Sparks mayor Ron Smith defended SPD and the Officers' actions. (*Id.* at 23-24.) Martini told the activists they "ha[d] no clue, really," about the lived experiences of police officers, and directed them to "[g]et off your collective butt." (*Id.* at 23.) Martini further opined, "[m]urdering people, black, brown whatever. It's kind of funny how they got murdered doing something that was against the law." (*Id.*) Smith voiced agreement with Martini at the meeting and stated, "I stand behind [Sparks] police department. I stand behind our chief and everyone who works there. I am proud of them." (*Id.* at 24.)

### E.    This Action

In sum, Plaintiffs' complaint asserts nine claims: (1) municipal liability for failure to train; (2) violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"); (3) municipal liability for ratification; (4) supervisor liability; (5) excessive force; (6) deprivation of familial relations; (7) wrongful death; (8) survival action; and (9) negligence.[11] (ECF No. 1.) Plaintiffs assert Claims 1-3 against Defendant City of Sparks ("City"), Claim 5 against Ahdunko only, Claims 4 and 6 against the Defendant Officers (Patterson, Hammerstone, Dejesus, Ahdunko), and Claims 7-9 against all Defendants.

///

///

---

[11]Plaintiffs do not consistently number their claims throughout the complaint, so the Court numbers the claims in the order they are listed on the complaint's first page.

III.    **DISCUSSION**

Two motions are before the Court. First is Plaintiffs' motion for partial summary judgment (ECF No. 78), addressing only the ADA claim. Second is Defendants' motion for summary judgment (ECF No. 83), involving all nine of Plaintiffs' claims.

The Court first addresses the parties' cross-motions for summary judgment on the the ADA claim, and concludes that neither party is entitled to summary judgment. Next, the Court addresses the Defendants' summary judgment motion on the remaining eight claims.

A. **Cross-Motions for Summary Judgment: Disability Discrimination under Title II of the ADA (Claim 2)**

Plaintiffs allege that the City, through the Officers' actions, failed to reasonably accommodate Lee's disability in violation of Title II of the ADA. (ECF No. 1 at 20-24.) In both cross-motions for summary judgment, the parties dispute whether the Officers effectively discriminated against Lee in violation of Title II by failing to reasonably accommodate his disability. (ECF Nos. 78 at 19-26, 83 at 25-28.) Defendants' cross-motion contends that the accommodations the Officers provided were reasonable as a matter of law, given the "exigent circumstances" of Lee's criminal activity and significant risk to others. (ECF Nos. 83 at 25-28, 90 at 24-28.) The Court finds that several triable issues of material fact exist as to whether the Officers' actions were reasonable accommodations under the alleged "exigent circumstances" of Lee's criminal activity. The Court will therefore deny both cross-motions as to the ADA claim.[12]

---

[12]Accordingly, the Court declines to address Plaintiffs' arguments that they have satisfied the other elements needed to establish liability on the ADA claim, as well as Plaintiffs' argument as to the damages issues. (ECF No. 78 at 21-22, 26-31.) Because the Court denies Plaintiffs' cross-motion on the discrimination portion of their ADA claim, Plaintiffs have ultimately failed to meet their "burden of demonstrating the absence of an issue of material fact." *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982); *see also Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) ("[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits.").

"The ADA applies broadly to police 'services, programs, or activities,'" and the Ninth Circuit has "interpreted these terms to encompass anything a public entity does." *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds sub nom. City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600 (2015) (internal citations and quotation marks omitted). "The ADA therefore applies to arrests," that is, police conduct during arrests. *Id.*

"To prove that a public program or service violated Title II of the ADA, a plaintiff must show: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g en banc* (Oct. 11, 2001) (internal citation and quotation marks omitted). When analyzing whether an individual has a disability under the ADA, courts construe statutory and regulatory definitions broadly. Indeed, the regulations expressly state that the definitions of "disability" and "substantially limits" must be "construed broadly in favor of expansive coverage." 28 C.F.R. §§ 35.108(a)(2)(i), (d)(1)(i). Several mental and emotional disorders—including major depressive disorder, bipolar disorder, and schizophrenia— are enumerated in the Title II regulation as disabilities that "at a minimum" substantially limit brain function.[13] *See id.* at § 35.108(d)(2)(iii)(K).

Plaintiffs assert that the City discriminated against Lee by failing to reasonably accommodate his disability when the Officers shot and killed him without considering his known mental illness, and without first deploying de-escalation tactics that would have prevented injury or death. (ECF No. 78 at 19-26.) *See also Sheehan*, 743 F.3d at 1232 (recognizing a Title II claim for arrests under a failure to accommodate theory of disability

---

[13]In their motion, Defendants do not dispute that Lee suffered from mental illness (*e.g.*, bipolar disorder), or that the Officers knew of Lee's mental illness and suicide ideations after Clopp's 911 call. (ECF No. 83 at 28-29.)

discrimination, "where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees"). Though Plaintiffs concede that Lee "had a presented a threat" at the Initial Crash Site—he "was fleeing and potentially had a gun"—the crux of Plaintiffs' argument hinges on the Officers' failure to reasonably accommodate Lee once he had crashed and become immobile at the Final Crash Site, just seconds before Patterson and Dejesus fired their rounds. (*Id.* at 22-23.) Plaintiffs identified several possible alternative actions available to the Officers once Lee was contained, including, but not limited to, "creating time and distance, slowing things down, and creating a tactical plan," calling CIT officers or the SWAT team, using oleoresin spray to safely force Lee out of the car, and using "active listening skills and verbal strategies." (*Id.* at 23-26.)

Conversely, Defendants argue in their cross-motion that Plaintiffs' ADA claim fails because the City did not discriminate against Lee based on his disability. They contend that the accommodations the Officers provided were reasonable as a matter of law, given the "exigent circumstances" of Lee's criminal activity (*e.g.*, evading arrest in a vehicle) and significant risk to others. (ECF Nos. 83 at 25-28, 90 at 24-28.)

The Ninth Circuit has recognized that the reasonableness of an accommodation is ordinarily a question of fact left to the jury. *See*, *e.g.*, *Sheehan*, 743 F.3d at 1233 (stating that "the reasonableness of an accommodation is ordinarily a question of fact," and denying the city's motion for summary judgment on an ADA claim). And the facts here support following this recognized approach. The parties dispute several facts that inform whether the Officers' actions were reasonable accommodations, particularly at the Final Crash Site, where Patterson and Dejesus shot and killed Lee. First, the parties dispute whether Lee posed a significant risk to the Officers and to others once his car stopped on the highway median at the Final Crash Site. The parties also dispute whether the Officers knew Lee was no longer a flight risk at the Final Crash Site and thus knew

whether de-escalation was then feasible for a "static" situation. Next, the parties dispute whether the use of reasonable accommodations suggested by Plaintiffs (*e.g.*, time, distance, perimeter, active listening, CIT officers, oleoresin spray) would sufficiently mitigate the risk of serious injury or death. Although the Officers may have had a MOST worker—a licensed therapist who assists police officers when dealing with mentally ill persons—at the scene, the Court finds that this action, alone, does not necessarily equate to a reasonable accommodation under Title II. (ECF Nos. 83 at 27, 83-5 at 10, 83-20 at 42-43.) Accordingly, the Court finds that these material factual disputes preclude a finding of summary judgment for either Plaintiffs or Defendants and will therefore deny both cross-motions for summary judgment on the ADA claim.

Additionally, the Court recognizes that "exigent circumstances," such as an individual's criminal activity and risk to the health and safety of others, "inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment." *Sheehan*, 743 F.3d at 1232 (citation omitted). But here, the Officers knew Lee was mentally unstable, armed, and invited the Officers' use of deadly force through "suicide by cop," and they could have deployed various reasonable accommodations early on, "including de-escalation, communication, or specialized help." *See Vos v. City of Newport Beach*, 892 F.3d 1036-37 (9th Cir. 2018). Such actions may have been available means to establish rapport and compliance with mentally ill individuals that are less intrusive than deadly force. Because it remains disputed whether these alternative actions were reasonable accommodations that the Officers could have made, the Court finds summary judgment inappropriate for either party on this additional basis.

In sum, the Court denies both Plaintiffs' and Defendants' cross-motions for summary judgment as to the ADA claim because both parties dispute whether the Officers reasonably accommodated Lee's disability under the circumstances.

///

///

**B.    Defendants' Motion for Summary Judgment**

**1.    Fourth Amendment Excessive Force (Claim 5)**

Plaintiffs allege that the Officers' use of deadly force was, under the circumstances, excessive and unreasonable in violation of Lee's Fourth Amendment rights. (ECF No. 1 at 28.) The Officers' use of deadly force was unreasonable, Plaintiffs argue, because they knew of Lee's mental disability yet failed to consider his mental illness and less drastic alternatives, and because Lee posed no imminent threat to the safety of others at the Final Crash Site. (*Id.* at 26-28.) Defendants counter that by reaching for his firearm, evading arrest in a speeding vehicle, and threatening to "die by cop," Lee posed an immediate threat to the Officers and to the public. (ECF No. 83 at 12-16.) Because Lee had threatened to "die by cop" and reached for his weapon after disobeying the Officers' commands, they argue, the Officers were entitled to use deadly force to defend themselves. (*Id.* at 15-16.) As explained further below, triable issues of material fact preclude finding that the Officers' use of force was objectively reasonable under the circumstances. Material factual disputes also preclude a finding that Defendants were entitled to qualified immunity.

**a.  Legal Framework**

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (citing U.S. Const. amend. IV and *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." *Graham*, 490 U.S. at 395. When assessing reasonableness, courts must allow for the fact that "police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Accordingly, "[e]xcessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001). The appropriate question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Put more directly, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

When evaluating the strength of the government's interest in the force used, courts consider "'the type and amount of force inflicted,'" as well as three factors as outlined in *Graham v. Connor*: "'(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat of safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "Among these considerations, the 'most important' is the second factor—whether the suspect posed an immediate threat to others." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1153 (9th Cir. 2022) (citation omitted).

But these three *Graham* factors are "not exclusive." *O'Doan*, 991 F.3d at 1033. "Other factors relevant to the reasonableness of force 'include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed.'" *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017) (quoting *Glenn v. Washington Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011)). Although law enforcement officers "need not avail themselves of the least intrusive means of responding to an exigent situation," they are "required to consider [w]hat other tactics if any were available." *Glenn*, 673 F.3d at 876 (internal quotations and citations

omitted). "[I]f there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militate[s] against finding [the] use of force reasonable.'" *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)). "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001); *see also Vos*, 892 F.3d at 1033-34.

The Ninth Circuit has repeatedly cautioned that "summary judgment should be granted sparingly in excessive force cases." *Est. of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017). Particularly in situations where the alleged excessive force killed the person subject to the seizure, courts must "carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (citation and quotations omitted). Such scrutiny is required to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify." *Id.* (citation and quotation marks omitted)

### b. Analysis

Several factual disputes preclude granting summary judgment. Critically, the parties dispute whether Lee reached for the gun in his lap when the Officers surrounded his car at the Final Crash Site. (ECF Nos. 89 at 16-18, 95 at 7-10.) This factual dispute dispositively shapes the Court's analysis of the second ("most important") *Graham* factor, that is, whether Lee posed an immediate safety threat to the Officers and to others at the Final Crash Site. *See Williamson*, 23 F.4th at 1153. If Lee had reached for his gun or raised it to threaten the Officers, they would be very likely justified in using deadly force to prevent harm to themselves or others. *See Cruz v. City of Anaheim*, 765

F.3d 1076, 1078 (9th Cir. 2014); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005). Conversely, because mere possession of a firearm does not justify using deadly force, the Officers' decision to shoot Lee would be likely unjustified if he did not reach for or raise his weapon. *See Cruz*, 765 F.3d at 1078-79; *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013); *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997).

But the Court's task does not end here. Additional scrutiny is warranted when evaluating whether a factual dispute exists, even if, like here, no witness has rebutted the Officers' accounts of what happened. Because the Officers killed Lee—the only other witness to all the events—the Court must carefully examine whether the Officers' recitations of events are supported by all the evidence. *See Gonzalez*, 747 F.3d at 795.

Here, the facts do not unquestionably support the Officers' testimony that Lee had reached for his gun before they opened fire. Particularly, statements by Patterson at times conflict with what the body cam recordings depict. Patterson stated numerous times, both immediately after the incident and during discovery, that he had seen Lee reach for his gun. (ECF Nos. 83-14 at 13:32-13:37, 91-18 at 7, 95 at 36.) Patterson has given two different accounts of his physical encounter with Lee at the Final Crash Site. On one hand, Patterson recounted that Lee had used both hands to reach for the gun between his legs while Patterson wrestled him out of the car. (ECF No. 91-18 at 7, 15.) On the other hand, Patterson also stated during discovery that Lee had reached for the gun with only his right hand while Patterson's police dog bit and latched onto Lee's left arm. (*Id.* at 15.) Patterson's observations also seem internally contradictory. In the same exact interrogatory answer, Patterson recounted that Lee somehow "had [both] hands on his gun between his legs," even though "Lee had reached for the gun with his right hand" while the K-9 service dog "was on Lee's left arm." (*Id.*)

While the Officers' body cam recordings do not perfectly depict what transpired between Lee and the Officers, they do at times contradict the Officers' accounts of what happened at the Final Crash Site. In Patterson's body cam footage, Lee's arms appeared to be crossed, and Lee's face, left bicep, and right hand are visible. (ECF No.

23

83-14 at 13:32-13:35.) Patterson's body cam footage directly contradicts Hammerstone's account in his post-shooting interview, in which he stated having noticed Lee's "right hand underneath his legs," which remained "down," even as Patterson tried to physically remove Lee from the vehicle. (ECF No. 83-23 at 24.) Although Patterson's body cam footage does not show Lee's full right arm while seated in the car, it shows Lee's full left arm being pulled out of the car by Patterson's service dog. (ECF Nos. 83-14 at 13:36-13:39, 83-15 at 14:20-14:22.) But once Patterson enters Lee's car to pull him out, Lee's arms and hands are no longer visible in the body cam footage. (ECF No. 83-14 at 13:39-13:43.) With such inconsistent accounts of this critical moment, whether Lee reached for his gun, if at all, with one hand or both hands is a material issue of fact for the jury to resolve.

Lastly, body cam footage shows that Hammerstone yelled, "I've got hands," three times while Patterson physically struggled with Lee inside the car. (ECF No. 83-15 at 14:16-14:18.) According to Plaintiffs' police practices expert witness Scott DeFoe, Hammerstone's repeated statement alerted the Officers that he could see Lee's hands, which "could be a form of compliance" to their commands for Lee to show his hands. (ECF No. 91-9 at 18.)

In light of the evidence presently before it, which the Court views in the light most favorable to Plaintiffs, Plaintiffs have cast sufficient doubt upon the Officers' recitations of events such that a rational factfinder could reasonably find that Lee was not reaching for his gun or threatening the Officers with it. Even assuming (1) the underlying offense (evading arrest and striking another car while fleeing police) was sufficiently "severe," (2) Lee's actions could be characterized as resisting arrest, (3) the Officers' orders to get out of the car and show hands constituted proper warnings, and (4) the Officers reasonably and genuinely did not know that Lee was incapable of flight due to his detached front wheel—all of which the parties reasonably dispute—the factual disputes about the threat Lee posed to the Officers preclude summary judgment in Defendants' favor.

///

### c. Qualified Immunity

Defendants next argue that even if the force used was excessive, they are entitled to qualified immunity. (ECF No. 83 at 19.) Because the Court views the facts in the light most favorable to Plaintiffs, the nonmoving parties, it considers whether the Officers would be entitled to qualified immunity had Lee not reached for his gun, had he not threatened the Officers in any way, had he eventually complied with the Officers' orders to show his hands, and had he been incapable of further flight.

While Plaintiffs have not pointed to controlling precedent that "'squarely governs' the specific facts at issue," *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)), summary judgment on the qualified immunity question is inappropriate here.[14] As discussed above, there is circumstantial evidence that tends to discredit the Officers' accounts of what transpired and that could give a reasonable jury pause. *See Cruz*, 765 F.3d at 1079-81 (reversing in part grant of summary judgment for defendant police officers due to "curious and material factual discrepancies" arising from "circumstantial evidence that could give a reasonable jury pause"); *Gonzalez*, 747 F.3d at 794-95 (requiring scrutinous analysis of the record—because the dead suspect cannot testify—to determine whether the officer's story is consistent, which includes "circumstantial evidence that, if believed, would tend to discredit the police officer's story") (citation and quotations omitted). Critically,

---

[14]Besides cases that insufficiently "define clearly established law at a high level of generality," *City & Cnty. of S.F., Cal. v. Sheehan*, 575 U.S. 600, 613 (2015) (internal citations and quotations omitted), Plaintiffs rely on just one Ninth Circuit case to show that the Officers' conduct violated clearly established law. (ECF No. 89 at 22.) The Court questions whether this case, *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014), is sufficiently analogous to the facts at issue here, such that an officer would have "fair notice" that a specific use of force was unlawful. *See Kisela*, 138 S. Ct. at 1153. Although the suspect in *Cruz* was also armed, attempted to escape the police, and ignored police commands, his conduct differs from Lee's in that he made a "threatening gesture" toward the police by reaching into his waistband, where an informant had previously told police he had a gun hidden. *Cruz*, 765 F.3d at 1078-79. Moreover, the Ninth Circuit only suggested in dicta that "if the suspect doesn't reach for his waistband [where a gun is believed to be] or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door"—far from controlling precedent. *Id*.

Patterson's accounts of whether Lee reached for the gun with one or both hands is not only internally inconsistent, but also inconsistent with Hammerstone's account.

Because such "curious and material factual discrepancies," *Cruz*, 765 F.3d at 1080, could lead a reasonable jury to disbelieve Patterson's version of events, a determination that Defendants are entitled to qualified immunity is premature at the summary judgment phase. The facts at issue here remain in dispute. Accordingly, Defendants are not entitled to summary judgment on their qualified immunity defense, and the Court will deny their motion as to Claim 5.

### 2.    Supervisor Liability (Claim 4)

Plaintiffs also assert a supervisor liability claim under § 1983 against Ahdunko, the supervising Officer present at the scene. (ECF Nos. 1 at 29-31, 91-1 at 53.) Plaintiffs specifically argue that Ahdunko "abrogated his supervisorial responsibilities" by leaving the scene to block and direct traffic and entrusting Patterson, his subordinate, with the de-escalation and control of the situation, knowing that Patterson was a problematic officer. (ECF No. 89 at 4, 22-23.) Conversely, Defendants assert that Ahdunko cannot be held liable for Patterson's conduct because Ahdunko neither acquiesced to Patterson's alleged constitutional violation nor showed a reckless or callous indifference toward Patterson's conduct. (ECF No. 95 at 13.) Defendants add that the shooting Officers' "use of force was a split-second decision over which Lt. Ahdunko had no control or involvement." (ECF No. 83 at 24.) Because a factfinder could reasonably find that Ahdunko either acquiesced to or showed reckless or callous indifference toward Patterson's actions, Ahdunko is not entitled to summary judgment on the supervisor liability claim.

Under § 1983, supervisors cannot be held liable for the acts of their subordinates under a *respondeat superior* theory. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). But a supervisor "can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; and 3) for conduct that showed a

reckless or callous indifference to the rights of others." *Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)); *see also Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998).

As for Ahdunko's supervisorial liability, several factual disputes preclude a finding of summary judgment in his favor. When viewing the evidence in the light most favorable to Plaintiffs, a juror could reasonably conclude that Ahdunko failed to properly supervise and control his subordinates throughout the incident, such that he acquiesced to his subordinates' unreasonable use of deadly force. *See Hyde*, 23 F.4th at 874. Hammerstone testified that Ahdunko did not take command of the situation and failed to tell the Officers to stand down and re-assess their plan, even though it was Ahdunko's responsibility to do this.[15] (ECF Nos. 89-7 at 13-14, 89-8 at 23.) Despite his purported objective to save Lee's life, Ahdunko stated he had trusted his subordinates' decisions and had not expected them to await his instructions or supervision while he blocked traffic near the Final Crash Site. (ECF No. 91-1 at 83-85.) Instead, Ahdunko expected the Officers to "act on their own," and he admitted that his subordinates never conveyed to him what their tactical plan, if any, was. (*Id.* at 85, 100.) Plaintiffs' expert witness Scott DeFoe stated being "very critical" of Ahdunko's supervisorial conduct and opined that Ahdunko "had a duty as a supervisor to command and control." (ECF No. 91-9 at 15-16, 26.) DeFoe stated that Ahdunko and his subordinates should have, among other things, (1) directed other SPD officers not involved in the chase to develop a tactical plan to handle the situation, (2) noticed that "Patterson's emotions drove this entire incident," such that he could not control himself, and (3) taken control of the incident from the start by calling CIT officers to the scene, developing a tactical plan, and slowing things down. (*Id.*)

---

[15]On the other hand, Hammerstone stated he had not expected Ahdunko to take command and control of the situation by giving specific orders. (ECF No 89-7 at 14.) Nevertheless, Hammerstone's own expectations of Ahdunko's supervisorial role during the incident, alone, does not entitle Ahdunko to summary judgment.

Because triable issues of fact exist as to whether Ahdunko can be held liable as a supervisor under § 1983, the Court will deny Defendants' motion for summary judgment on this claim.

### 3.    Municipal Liability (Claims 1 & 3)

Plaintiffs also assert that the City is liable under § 1983 through the municipal liability doctrine set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as alleged in two separate claims—failure to train (Claim 1) and ratification (Claim 3). (ECF Nos. 1 at 13-20, 24-26, 89 at 25-31.) Defendants argue they are entitled to summary judgment on Plaintiffs' failure to train theory because the evidence shows the City had given the Officers proper training in the first place, even if they ultimately failed to follow such training. Defendants also assert that Plaintiffs' ratification theory fails because the City had disciplined Patterson once before for unrelated issues involving the use of his police dog, and because the City had in fact investigated Lee's shooting by hiring third-party agencies that ultimately found no wrongdoing.

To establish municipal liability under *Monell*, a plaintiff must prove that "(1) [they were] deprived of a constitutional right; (2) the municipality has a policy; (3) the policy amounted to a deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. City of L.A.*, 977 F.3d 737, 741 (9th Cir. 2020). "A plaintiff can satisfy *Monell*'s policy requirement in one of three ways." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). "First, a local government may be held liable when it acts 'pursuant to an expressly adopted official policy.'" *Id.* (quoting *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014)). "Second, a public entity may be held liable for a 'longstanding practice or custom.'" *Id.* (quoting *Thomas*, 763 F.3d at 1170). "Third, 'a local government may be held liable under Section 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id.* (quoting *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on*

*other grounds by Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016)). "The Supreme Court has made clear that policies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, and, in rare instances, single constitutional violations [that] are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (internal citations omitted). But "generally, a single instance of unlawful conduct is insufficient to state a claim for municipal liability under § 1983." *Id.* at 1154.

By first asserting a "longstanding practice or custom" theory of *Monell*'s policy requirement, Plaintiffs allege that the City has failed to properly train its police officers, and that it has long failed to adequately investigate or discipline police officers for constitutional violations. (ECF No. 1 at 14-15.) Plaintiffs also assert a ratification theory of *Monell*'s policy requirement, arguing that the City's response to Lee's death amounts to ratification of the Officers' unconstitutional conduct. (*Id.* at 24-26.) Because Plaintiffs have shown there is a genuine dispute of material fact as to both theories, the Court will deny Defendants' summary judgment motion on the *Monell* claims.

### a. Practice or Custom

Plaintiffs first allege that, as a matter of custom or practice, the City has failed to train its police officers on their constitutional responsibilities when handling mentally ill people. (*Id.* at 14-15.) Plaintiffs challenge, in pertinent part, the City's "systematic, historical custom and practice" as (1) the failure to provide adequate de-escalation trainings for handling mentally ill persons and (2) the failure to discipline officers for violating SPD policies and trainings. (ECF No. 89 at 26-30.)

"Failure to train may constitute a basis for *Monell* liability where the failure amounts to deliberate indifference to the rights of those who deal with the municipal employees." *Benavidez*, 993 F.3d at 1153 (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)). "To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training

policy that amounts to deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Id.* at 1153-54. Importantly, "deliberate" indifference is required—"[m]ere negligence will not suffice to show *Monell* liability." *Id.* at 1153-54. A plaintiff must prove that "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.*

When viewing the evidence in the light most favorable to Plaintiffs, a rational factfinder could conclude that the Officers' training was inadequate because the Officers nevertheless failed to comply with SPD policy throughout the incident. The Officers did not comply with General Order DM 7.1, which establishes CIT officer procedures in situations where, like here with Lee, an officer "goes to a call and determines that it meets the criteria to dispatch a CIT officer" (ECF No. 79-4 at 20.) Such "criteria" include "[e]vents involving persons threatening suicide under violent/volatile circumstances, *e.g.*, [a] person is armed and threatening/holding [a] weapon/firearm/other instrument," and "[d]isturbances involving persons known to have reported or diagnosed mental illnesses, *e.g.*, domestic events reported by family members [and] crimes involving mentally-ill persons." (*Id.* at 19-20.) When satisfied that an encounter meets these CIT criteria, the Officers were supposed to "make contact with the CIT officer even before the CIT officer's arrival on scene, if possible, to explain the situation and coordinate tactics." (*Id.*) Even after hearing from Clopp and dispatch that Lee was bipolar, suicidal, and armed, the Officers either failed to recognize that this was a situation that may require CIT involvement or, alternatively, did recognize that Lee may require CIT assistance but failed to notify dispatch of that fact. Had the Officers recognized that Lee had a mental illness and needed CIT assistance, they would have been required to respond with de-escalatory tactics under DM 7.1, including consideration of "less-lethal forms of force" and alerts to the SWAT team and crisis negotiators. (*Id.* at 20-21.) The Officers did not

consider these options. In fact, Hammerstone acknowledged in his deposition that it was SPD's practice to *not* call CIT, and that neither he nor any other officer he knew had called for CIT during his 16-year career at SPD. (ECF No. 89-8 at 7.) The existence of protective policies does little for a local community if police officers are unable to recognize situations in which they are required. Accordingly, the Court finds that summary judgment is not appropriate on Plaintiffs' failure to train theory.

The second custom or practice theory for Plaintiffs' *Monell* claim asserts that the City has failed to properly investigate and discipline the Officers' misconduct, and that failing to do so comported with the City's historical custom and practice of refusing to either investigate policy violations or discipline violating officers. (ECF No. 89 at 26, 28-29.) A plaintiff "can also establish liability under a failure to discipline theory by showing 'repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded.'" *Elifritz v. Fender*, 460 F. Supp. 3d 1088, 1020 (D. Or. 2020) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992)). Defendants contest that the City has in fact disciplined officers that violated SPD policies, citing one instance in which Patterson was disciplined for an unrelated issue involving the use of his police dog, along with SPD's purported compliance with the DA's post-shooting criminal investigation. (ECF No. 95 at 14-15.)

Defendants' argument is unpersuasive, especially in light of evidence that creates triable issues of fact about SPD's alleged custom or practice of failing to investigate policy violations or discipline violators. Plaintiffs first offer the testimony of SPD Chief Chris Crawforth, who stated he was unaware of any instance in the previous 15 years in which SPD completed a "use of force form" or conducted an administrative review for an officer-involved shooting. (ECF Nos. 91-5 at 30, 79-4 at 17.) The failure to internally investigate officer-involved shootings violates SPD's General Order DM 9.1, a mandatory policy that requires an internal "administrative review of the officer involved shooting" after the completion of any post-shooting criminal investigation. (ECF No. 79-4 at 17.) The internal affairs review "will include background information about the

shooting, an overview of the investigation and an analysis of applicable policies." (*Id.*) Plaintiffs also offer the testimony of former SPD Chief Peter Krall, who confirmed that it was not his practice to meet and talk with officers during the days or weeks following their involvement in shootings. (ECF No. 89-6 at 9.) According to Plaintiffs' expert witness Scott DeFoe, it is "unheard of" for police departments to not conduct comprehensive, internal investigations whenever a loss of life results from officers' actions. (ECF No. 97-9 at 35.) Finally, as Plaintiffs argue, the DA's criminal investigation and report did not consider whether the Officers violated Lee's constitutional rights, nor does it supplant SPD's internal affairs investigation requirement under DM 9.1. (ECF No. 89 at 29.) Crawforth's admission, taken together with the fact that no internal affairs investigation has occurred for officer-involved shootings—in violation of SPD policy— establishes a triable issue of material fact about (1) whether SPD had a custom of failing to investigate officer-involved shootings and failing to discipline officers for constitutional violations (*e.g.*, excessive force), and (2) whether such a custom over several years evidences SPD's deliberate indifference to its officers' unconstitutional actions.

For these reasons, summary judgment is not appropriate on either of Plaintiffs' custom or practice theories of municipal liability.

### b.  Ratification

In addition to the City's alleged custom of failing to adequately train, investigate, or discipline its officers, Plaintiffs also assert a ratification theory of municipal liability. Plaintiffs allege that the City approved, defended, and therefore ratified the Officers' violation of Lee's constitutional rights. (ECF No. 89 at 30-31.) A municipality may be liable under § 1983 if "an official with final policy-making authority . . . ratified a subordinate's unconstitutional decision or action and the basis for it." *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 802-03 (9th Cir. 2018). "To show ratification, a plaintiff must prove that the 'authorized policymakers approved a subordinate's decision and the basis for it.'" *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

Plaintiffs first offer the testimony of SPD Chief Crawforth, who confirmed that he approved of Patterson's "quick response" and decisions to (1) not call the CIT team from the start, (2) not develop a tactical plan with his fellow Officers, and (3) shout commands at Lee without verbal warnings before using deadly force. (ECF No. 91-6 at 16, 20.) Crawforth also confirmed his approval of Dejesus's techniques and use of force at the Final Crash Site. (*Id.* at 14.) Plaintiffs also proffer statements by former Sparks mayors Geno Martini and Ron Smith, who both publicly defended the Officers' actions in handling Lee and "st[oo]d behind" SPD, then-SPD Chief Krall, "and everyone who works there." (ECF No. 91-18 at 22-24.)

Viewing this evidence in the light most favorable to Plaintiffs, a factfinder could reasonably conclude that Crawforth, Martini, or Smith, as authorized policymakers, ratified the Officers' actions and their underlying bases. Given that Plaintiffs have created a genuine issue of material fact as to this issue, summary judgment is also not appropriate on Plaintiffs' ratification theory of municipal liability.

### 4.      Fourteenth Amendment: Deprivation of Familial Relations (Claim 6)

Plaintiffs assert a claim for deprivation of familial relations and the right of association with Lee as his surviving parents. (ECF No. 1 at 30-31.) Defendants argue they are entitled to summary judgment on this claim because the Officers had no time to actually deliberate about the appropriate level of force to use in detaining and arresting Lee, and because they did not act with a purpose to harm Lee unrelated to a legitimate law enforcement objective. (ECF No. 83 at 22-23.) As explained below, the Court finds that whether Defendants' actions shock the conscience—in violation of the Fourteenth Amendment—is a question involving disputed material facts that a factfinder must resolve. Accordingly, the Court denies Defendants' motion for summary judgment on this claim.

///

///

#### a.     Legal Framework

Freedom of familial association is protected by the Fourteenth Amendment of the Constitution. *See Erotic Serv. Provider Legal Educ. and Rsch. Project v. Gascon*, 880 F.3d 450, 458 (9th Cir. 2018). "[C]hoices to enter into and maintain certain human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984); *see also Rueda Vidal v. U.S. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604, 624 (C.D. Cal. 2021) ("Although the Court cautioned that appropriate limits on substantive due process are necessary, it found that 'bonds uniting the members of the nuclear family,' as well as extended family, are 'deeply rooted in this Nation's history and tradition.'" (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 502-04 (1977)). The relationship between a parent and a child has been expressly recognized by the Supreme Court as constitutionally protected. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545-46 (1987).

Courts require plaintiffs asserting a § 1983 claim for deprivation of familial relations to "prove that the officers' use of force 'shock[ed] the conscience.'" *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). To determine whether an officer's use of force "shocks the conscience," the Ninth Circuit has applied two "subset" standards—"deliberate indifference" and "purpose to harm"—and determining which standard to apply turns on whether "actual deliberation [wa]s practical" for the officer. *Porter*, 546 F.3d at 1137-38. "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes*, 736 F.3d at 1230. "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, [their] conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

#### b.    Analysis

Defendants argue they are entitled to summary judgment because there was no time for the Officers to actually deliberate and, as such, they did not act with a purpose to harm that was unrelated to legitimate law enforcement objectives. (ECF No. 83 at 38-39.) In essence, Defendants argue that because actual deliberation was not practical for the Officers, the Court must apply the more exacting "purpose to harm" standard. (ECF Nos. 83 at 22-23, 95 at 11-12.)

When viewing the record in the light most favorable to Plaintiffs, a reasonable juror could conclude that the Officers had multiple chances to actually deliberate about the appropriate level of force necessary to arrest Lee. If the Court only considered the time between when Lee's car stopped at the Final Crash Site and when the Officers fired—a timeframe of about 35 seconds—the Officers would have little time to no chance to consider whether to use deadly force. But when viewed holistically, the Officers had ample time to deliberate and form a more appropriate plan to approach, detain, and arrest Lee. About 16 minutes transpired between Clopp's 911 call—through which the Officers learned of Lee's mental illness, criminal history, and possession of a firearm—and the moment the Officers shot Lee. (ECF No. 83-23 at 12.) About five minutes after the 911 call, SPD Officers Bader and Wisneski met and spoke with Clopp, who informed them that Lee had been "mentally unstable" since "he was a baby," was suicidal, "ha[d] a history of drug use," and was armed. (ECF No. 83-11 at 6:34-7:34.) Five minutes after that, but before locating Lee's vehicle, Patterson himself spoke with Clopp, who directly warned him that Lee "ha[d] a gun and said he was going to die by cop or by suicide." (ECF No. 83-14 at 6:34-6:45.) In turn, Officer Patterson warned fellow SPD officers that Lee was "possibly suicidal by cop." (*Id.* at 6:46-6:54.) Unlike in *Hayes*, where the officers purportedly had no reason to expect that the suspect would have a weapon, the Officers heard from Clopp, either directly or indirectly through dispatch, that Lee had a gun and had long suffered from mental illness and drug use. *See* 736 F.3d at 1230 (noting the police officer's "snap judgment" was based on the "unexpected" appearance of a knife);

*see also Gonzalez*, 747 F.3d at 792, 797-98 (applying the "purpose to harm" standard after noting the police officers "had no information" that the suspect "had previously committed any crime, had any prior contact with law enforcement, or had any involvement with weapons").

The Officers' own actions demonstrate that they had various opportunities for actual deliberation as to what level of force to apply in detaining Lee. The Officers in fact seized such an opportunity to strategize at the Initial Crash Site, where Lee was temporarily boxed in between Patterson and another driver. There, Ahdunko blocked off traffic with his patrol vehicle and instructed Hammerstone to use a 40-millimeter less-lethal shoulder launcher to shoot out Lee's front window. (ECF No. 83-6 at 19.) Patterson hoped that shattering the window would provide an avenue for his K-9 service dog to enter Lee's vehicle, disrupt Lee's actions, and give the Officers more time to restrain Lee. (ECF No. 83-23 at 22.) Though ultimately unsuccessful, Hammerstone obeyed Ahdunko's orders and shot a hole into Lee's front driver side window. (ECF No. 83-15 at 12:07-12:38.) At the Final Crash Site, the Officers had yet another opportunity to assess and reevaluate the appropriate level of force to use in arresting Lee, who was incapable of further vehicular flight due to the detached front wheel.

Viewing these facts together in the light most favorable to Plaintiffs, a reasonable jury could find that the Officers had opportunities to deliberate and form an appropriate plan to arrest Lee before any threatening situation would occur. Yet the Officers did not pause to reevaluate their plan. Even after Lee evaded the Officers twice and failed to comply with shouted commands, the Officers did not reconsider their approach—all while aware of Lee's mental illness and history of drug use. The Officers had ample time to consider, reflect, and anticipate what could happen before they even located Lee. Restricting the inquiry to only consider the events between Lee's final stop at the Final Crash Site and Patterson and Dejesus's fatal shots—about 35 seconds—would require the Court to ignore significant pieces of information the Officers learned and apparently disregarded. Accordingly, the facts do not support a finding as a matter of law that there

1 was no opportunity for the Officers to actually deliberate about the anticipated use of

2 force and potential alternatives for de-escalation. Because the Officers' failure to actually

3 deliberate could suffice to shock a reasonable juror's conscience, the Court denies

4 Defendants' summary judgment motion on this claim and declines to reach Defendants'

5 purpose to harm argument.

### 5.    Wrongful Death (Claim 7)

7      Defendants' argument that they are entitled to summary judgment on Plaintiffs'

8 wrongful death claim mirrors the arguments made on Plaintiffs' excessive force claim

9 and is for the same reasons unpersuasive. (ECF No. 83 at 28-29.) Nevada law permits a

10 decedent's heirs and personal representatives to a claim for damages "[w]hen the death

11 of any person . . . is caused by the wrongful act or neglect of another." NRS § 41.085(2).

12 Defendants in gist argue they were justified in shooting Lee and therefore acted

13 reasonably, not wrongfully, under the Fourth Amendment. (*Id.* at 29.) But, as explained

14 above, because factual disputes preclude a finding that the Officers used reasonable

15 force in shooting and killing Lee, it remains disputed whether the Officers' actions were

16 justified. Accordingly, the Court denies Defendants' motion for summary judgment on the

17 wrongful death claim.

### 6.    Survival Action (Claim 8)

19      Like the wrongful death claim, Defendants characterize—and contest—Plaintiffs'

20 survival action as either a battery or negligence claim.[16] Defendants' argument that they

21 are entitled to summary judgment on Plaintiffs' survival action again mirrors the

22 arguments made on the excessive force claim and is for the same reasons

23 unpersuasive. (ECF No. 83 at 28-29.) Nevada law authorizes survival actions by the

24 executor or special administrator of a decedent's estate.[17] *See* NRS § 41.100(1); *Gonor*

---

[16]Plaintiffs do not assert a battery claim, and the Court will not construe the survival action or the wrongful death claim as such. (*See generally* ECF No. 1.)

[17]Clopp and Fridge bring this survival action in their individual capacities as co-special administrators. (ECF No. 1 at 3, 32-33.) *See also* NRS §§ 41.100(1), 132.040.

1  *v. Dale*, 432 P.3d 723, 726 (Nev. 2018); *Jones v. Las Vegas Metro. Police Dep't*, 873

2  F.3d 1123, 1128 (9th Cir. 2017). As explained above, material factual disputes preclude

3  a finding that the Officers used reasonable force or were otherwise justified in shooting

4  and killing Lee. Accordingly, the Court denies Defendants' motion for summary judgment

5  on the survival action.

6         **7.**     **Negligence (Claim 9)**

7         Defendants argue they cannot be liable for negligence because, first, negligence

8  is not a cognizable cause of action for the Officers' intentional act of shooting Lee, and

9  second, the Officers' discretionary acts are statutorily immune under NRS § 41.032(2).

10  (ECF Nos. 83 at 30, 95 at 15.) Plaintiffs do not respond to either argument. Instead,

11  Plaintiffs' response asserts that NRS § 41.0036(2)'s exception to the doctrine shielding

12  public entities from liability applies here, which Defendants do not argue. (ECF No. 89 at

13  31.) But this response is essentially a non-response. The Court therefore agrees with

14  Defendants that Plaintiffs have failed to respond and, in turn, have consented to the

15  granting of summary judgment on their negligence claim to the extent that the claim is

16  based on (1) the Officers' intentional conduct and (2) Defendants' negligent hiring,

17  training, and supervision. (ECF No. 95 at 15.) *See also Paulos v. FCH1, LLC*, 456 P.3d

18  589, 591, 596 (Nev. 2020) (concluding that a police department's decision to hire and

19  train a defendant police officer—who caused a woman to suffer second- and third-

20  degree burns while attempting to arrest her on hot asphalt—was protected under

21  Nevada's discretionary immunity doctrine under NRS § 41.032(2)).

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

**IV.     CONCLUSION**

2       The Court notes that the parties made several arguments and cited to several

3   cases not discussed above. The Court has reviewed these arguments and cases and

4   determines that they do not warrant discussion as they do not affect the outcome of the

5   motions before the Court.

6       It is therefore ordered that Plaintiffs' motion for partial summary judgment (ECF

7   No. 78) is denied.

8       It is further ordered that Defendants' motion for summary judgment (ECF No. 83)

9   is granted as to Plaintiffs' negligence claim (Claim 9) and is denied as to Plaintiffs'

10  remaining claims.

11      DATED THIS 16th Day of March 2023.

12

13  _____

14  MIRANDA M. DU
    CHIEF UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28